JONATHAN E. NUECHTERLEIN

(General Counsel)

BENJAMIN R. DAVIDSON (DC Bar No. 975509)
bdavidson@ftc.gov
KAREN S. HOBBS (DC Bar No. 469817)
khobbs@ftc.gov
Federal Trade Commission
600 Pennsylvania Avenue, NW, H-286
Washington, DC 20580
202-326-3055 (Davidson)
202-326-3587 (Hobbs)
202-326-3395 (Fax)

BLAINE T. WELSH
blaine.welsh@usdoj.gov
Assistant United States Attorney
Nevada Bar No. 4790
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV 89101
702-388-6336
702-388-6787

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

_____ )    Case No. _____
                                         )
FEDERAL TRADE COMMISSION,                )
                                         )
            Plaintiff,                   )
                                         )
v.                                       )
                                         )
CARDFLEX, INC.,                          )
                                         )
a California corporation;                )    **COMPLAINT FOR**
                                         )    **PERMANENT INJUNCTION**
BLAZE PROCESSING, LLC, an Idaho limited  )    **AND OTHER EQUITABLE**
liability company;                       )    **RELIEF**
_____  )

1

————————————————————————— )

MACH 1 MERCHANTING, LLC, an Idaho )

limited liability company; )

ANDREW M. PHILLIPS, individually and as an )
officer of CardFlex, Inc.; )

JOHN S. BLAUGRUND, individually and as an )
officer of CardFlex, Inc.; )

SHANE FISHER, individually and as a manager )
of Blaze Processing, LLC, and Mach 1 )
Merchanting, LLC; )

and JEREMY LIVINGSTON, individually and as )
a manager of Blaze Processing, LLC, and Mach 1 )
Merchanting, LLC; )

)

Defendants. )
————————————————————————— )

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

      1.   The FTC brings this action under Section 13(b) of the Federal Trade Commission

Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or

reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten

monies, and other equitable relief against CardFlex, Inc., Blaze Processing, LLC, Mach 1

Merchanting, LLC, Andrew M. Phillips, John S. Blaugrund, Shane Fisher and Jeremy

Livingston ("Defendants") for engaging in unfair acts or practices in connection with

Defendants' processing or arranging for processing of charges to consumers' credit and debit

cards on behalf of Defendants' merchant clients, in violation of Section 5(a) of the FTC Act,

15 U.S.C. § 45(a).

1

**JURISDICTION AND VENUE**

2.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3.   Venue is proper in this district under 28 U.S.C. § 1391(b), and 15 U.S.C. § 53(b).

**PLAINTIFF**

4.   The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5.   The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. § 53(b).

**DEFENDANTS**

6.   Defendant CardFlex, Inc., is a corporation organized under the laws of the State of California.  CardFlex, Inc. formerly operated as CardFlex Financial Services, LLC, a limited liability corporation organized under the laws of the State of Nevada.  CardFlex, Inc.'s principal place of business is located at 2900 Bristol Street, Building F, Costa Mesa, California 92626.  CardFlex, Inc. is an independent sales organization ("ISO") that is paid a fee for arranging for merchants to obtain merchant accounts to process credit card sales transactions with a bank with which CardFlex, Inc. has a contractual relationship.  CardFlex, Inc. also acted as a gateway that handled some of the technical aspects of the actual payment processing.  CardFlex, Inc. transacts or has transacted business in this district.

2

7.   Defendant Blaze Processing, LLC, is a limited liability company organized under the laws of the State of Idaho.  Blaze Processing, LLC conducts business from P.O. Box 777, Rigby, Idaho 83442-0777.  Blaze Processing, LLC is a sales agent that arranges connections between merchants like iWorks and ISOs like CardFlex, Inc.  Blaze Processing, LLC transacts or has transacted business in this district.

8.   Defendant Mach 1 Merchanting, LLC, is a limited liability company organized under the laws of the State of Idaho.  Mach 1 Merchanting, LLC's principal place of business is located at 7009 S. Marble Circle, Idaho Falls, Idaho 83406-8207.  Mach 1 Merchanting, LLC is also a sales agent that arranges connections between merchants like iWorks and ISOs like CardFlex, Inc.  Mach 1 Merchanting, LLC transacts or has transacted business in this district.

9.   Defendant Andrew M. Phillips is the President and a director of CardFlex, Inc. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of CardFlex, Inc., including the acts and practices set forth in this Complaint.  Phillips transacts or has transacted business in this district.

10. Defendant John Blaugrund is an officer and a director of CardFlex, Inc.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of CardFlex, Inc., including the acts and practices set forth in this Complaint.  Blaugrund transacts or has transacted business in this district.

11. Defendant Shane Fisher is a manager and principal of Blaze Processing, LLC, and Mach 1 Merchanting, LLC.  At all times material to this Complaint, acting alone or in

3

concert with others, he has formulated, directed, controlled, or participated in the acts and practices of Blaze Processing, LLC and Mach 1 Merchanting, LLC, including the acts and practices set forth in this Complaint.  Fisher transacts or has transacted business in this district.

12. Defendant Jeremy Livingston is a manager and principal of Blaze Processing, LLC, and Mach 1 Merchanting, LLC.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of Blaze Processing, LLC and Mach 1 Merchanting, LLC, including the acts and practices set forth in this Complaint.  Livingston transacts or has transacted business in this district.

## COMMERCE

13. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## SUMMARY OF CASE

14. This is an action by the FTC for injunctive and equitable monetary relief on behalf of consumers against Defendants for their actions in causing more than $26 million in unauthorized charges to consumers' credit and debit card accounts.  Defendants caused these unauthorized charges by arranging for a group of interrelated merchants, known as iWorks, to obtain and maintain merchant accounts that enabled iWorks to process unlawful credit and debit card payments through the Visa and MasterCard payment networks.  Defendants caused these charges to consumers' credit card accounts by actively employing, and advising or enabling the fraudulent merchants to employ, numerous tactics that were designed to

evade fraud monitoring programs implemented by Visa and MasterCard.  Defendants' tactics included: (1) opening any merchant account with minimal underwriting as long as the account was personally guaranteed by iWorks' President; (2) opening at least 293 merchant accounts in 30 separate corporate names for processing iWorks transactions; (3) implementing a system by which iWorks was able to distribute  sales transactions and chargebacks among their numerous merchant accounts in order to avoid detection by the credit card networks (a tactic known as "load balancing"); and (4) ignoring excessive rates of transactions returned by consumers ("chargebacks") on iWorks' merchant accounts.

15. Defendants knew or should have known that the merchants were deceptively offering consumers free or risk-free information about products or services such as government grants in order to deceptively enroll consumers in costly membership programs and repeatedly charge consumers' credit cards without their authorization.  Evidence of the merchants' scam included the numerous consumer disputes challenging unauthorized charges; chronically excessive chargebacks;  publicly available merchant websites with facially deceptive statements; and notices that several merchant accounts warranted placement in Visa and MasterCard chargeback monitoring and reduction programs.

16. Defendants' acts and practices enabled iWorks to establish and prolong its deceptive marketing and sales, resulting in more than $26 million in unauthorized charges to consumers' accounts.

## DEFENDANTS' PAYMENT PROCESSING BUSINESS

17. Defendants CardFlex Inc., Andrew Phillips and John Blaugrund (collectively "CardFlex") are in the business of identifying merchants in need of credit and debit card processing services and helping them to establish merchant accounts with a financial

5

institution ("merchant bank").  Without access to a merchant bank that is a member of the card associations, such as MasterCard or Visa, merchants are not able to accept consumer credit or debit card payments.

18. At all times material to this complaint, CardFlex worked as an ISO soliciting merchants ("merchant-clients") in need of payment processing services and signing them up for merchant accounts through banks and payment processors.  CardFlex referred merchant-clients to Wells Fargo Bank ("Wells Fargo") and its payment processor First Data Merchant Services ("First Data").  A payment processor is an entity that merchants and merchant banks use to transmit credit and debit card transaction data, and allocate or settle funds between merchants and consumers via merchant accounts.  Merchant banks (also referred to as "acquiring banks") frequently enter into contracts with payment processors that manage the bank's merchant processing program.

19. CardFlex essentially acted as an intermediary to link its merchant-clients and merchant banks.  CardFlex was compensated through a contractual arrangement with Wells Fargo and First Data.  Under the contract, CardFlex received payments for referring its merchant-clients to the merchant banks for payment processing.  CardFlex's payments were based on the volume of transactions that its merchant-clients processed through the merchant banks.  The greater the volume, the more CardFlex earned.  CardFlex also earned a fee for processing each chargeback incurred by its merchant-clients.

20. In February 2009, Defendant CardFlex entered into an "Agency Agreement" with Defendants Mach 1 Merchanting, LLC, Fisher, and Livingston ("Mach 1").  Later, in October 2009, CardFlex entered into a new Agency Agreement, with similar terms, with Defendants Blaze Processing, LLC, Fisher, and Livingston (together with Mach 1, "Blaze").

6

Under the Agency Agreements, Blaze agreed to act as Defendant CardFlex's agent in soliciting merchants who met certain underwriting requirements.  In connection with the Agency Agreement, Blaze facilitated communications between CardFlex and its merchants-clients, assisted its merchant-clients to complete CardFlex's applications for merchant accounts with merchant banks, and performed underwriting on its merchant-clients.

21. From 2009 to 2010, Defendants serviced merchant accounts for iWorks through approximately 30 interrelated companies owned and controlled by iWorks and its principals. These companies include Big Bucks Pro, Inc.; Blue Streak Processing, Inc.; Bottom Dollar, Inc.; Bumble Marketing, Inc.; Business Loan Success, Inc.; Cutting Edge Processing, Inc.; Diamond J. Media, Inc.; Ebusiness First, Inc.; Ebusiness Success, Inc.; Ecom Success, Inc.; Excess Net Success, Inc.; Fiscal Fidelity, Inc.; Funding Search Success, Inc.; Funding Success, Inc.; GG Processing, Inc.; GGL Rewards, Inc.; Hooper Processing, Inc.; Internet Fitness, Inc.; Net Business Success, Inc.; Net Commerce, Inc.; Net Discounts, Inc.; Net Fit Trends, Inc.; Network Agenda, LLC; Optimum Assistance, Inc.; Pro Internet Services, Inc.; Razor Processing, Inc.; Simcor Marketing, Inc.; Summit Processing, Inc.; Unlimited Processing, Inc.; and Xcel Processing, Inc. (collectively, "iWorks").

22. iWorks operated several related scams in which it lured consumers through websites that purported to offer free or risk-free information about products or services such as government grants to pay personal expenses and Internet-based money-making opportunities.  iWorks' websites were replete with misrepresentations about the availability of grants for personal expenses and the likely profitability of the money-making opportunities.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
26
27
28

23. The iWorks websites lured consumers into an expensive bait and switch.  After viewing misrepresentations on iWorks' websites, consumers were led to believe they would be charged only a small fee for shipping and handling, such as $1.99 or $2.99, to receive information about obtaining government grants or making substantial amounts of money. Consumers would then fill out a form and provide their credit card or bank account information.  However, buried in the fine print on the iWorks websites (if disclosed at all) or on a separate terms page were additional terms that completely transformed the offer. Instead of providing a free product or service for the nominal shipping and handling fee, iWorks enrolled consumers in multiple expensive online plans and charged recurring fees or other additional fees until consumers affirmatively cancelled enrollment in the plan ("Negative Option Plans").  iWorks enrolled consumers in online Negative Option Plans for both the advertised product as well as for additional products and services.  Pursuant to the Negative Option Plans, iWorks charged consumers' credit cards hefty one-time fees of as much as $189 and then recurring monthly fees of as much as $59.95 for the core product, as well as recurring monthly fees for the additional products and services costing as much as $39.97.

24. The iWorks scam lasted from at least 2006 until January 13, 2011, and ceased only after this Court granted the FTC's request for a temporary restraining order ("TRO") halting the scheme.  *See FTC v. Jeremy Johnson, et al.* No. 2:10-cv-2203-RLH-GWF (D. Nev., filed December 21, 2010).

25. The FTC suit charged iWorks, its owner Jeremy Johnson, and numerous other individual and corporate defendants with engaging in widespread deception in violation of Section 5 of the FTC Act, as well as other law violations.

8

26. From August 2009 until April 2010, Defendants opened and managed at least 293 merchant accounts in 30 separate corporate names for processing iWorks transactions. Opening and managing these merchant accounts enabled iWorks to maintain largely unfettered access to the credit card payment system and to use its merchant accounts to initiate more than $26 million in unauthorized charges to consumers' credit and debit card accounts.

## UNDERWRITING AND MONITORING MERCHANT ACCOUNTS

27. Merchant banks and payment processors have underwriting criteria that a merchant must meet to obtain a merchant account.  These criteria are designed to avoid losses associated with sales transactions that are charged back, especially losses due to transactions induced by fraud or unauthorized transactions.  A chargeback occurs when customers contact their credit card issuing bank to dispute a charge appearing on their credit card account statements, and the issuing bank charges that amount back to the merchant bank.  Each chargeback receives a chargeback reason code that describes the nature of the dispute, such as "no authorization obtained" or "requested/required authorization not obtained and fraudulent transaction."

28. The card associations (e.g., Visa and MasterCard) have established compliance monitoring programs that identify (by billing descriptor) those merchants which generate excessive numbers of chargebacks and have high chargeback rates.  The card associations calculate a merchant's chargeback rate as a ratio, which represents the number of chargebacks generated by the merchant in a particular month divided by the number of sales transactions submitted by the merchant in the preceding month.

9

29. When a merchant generates excessive chargebacks and has a high chargeback rate for two consecutive months, Visa and MasterCard place the merchant in compliance monitoring programs designed to detect and correct practices that harm consumers and to protect the integrity of the payment system.

30. For example, Visa identifies U.S. merchants for its Merchant Chargeback Monitoring Program ("MCMP") when the following three conditions arise in the same calendar month: (a) a merchant has at least 100 sales transactions; (b) the merchant has at least 100 chargebacks; and (c) the merchant has a chargeback rate of at least one percent. MasterCard maintained similar thresholds and triggers for its "Excessive Chargeback Merchant" program ("ECM").

31. To assist in the underwriting process, the card associations have created a program to track merchants and individuals that previously have had merchant accounts terminated by merchant banks for, among other things, excessive chargebacks. MasterCard, for example, maintains the Member Alert to Control High-risk Merchants ("MATCH") list. This list includes merchants (along with the principals) whose accounts were terminated by merchant banks for certain reasons. For example, a merchant bank must place a merchant on the MATCH list when the merchant bank terminates the merchant's processing account for fraud, excessive chargebacks or other violations of card association operating rules. Many acquiring banks will refuse to establish merchant accounts for merchants or individuals who appear on the MATCH list, given the high risk involved.

32. CardFlex's ISO agreement with Wells Fargo and First Data required CardFlex to solicit and sign up only those merchants that met the parameters of the underwriting policies established by Wells Fargo and First Data. Blaze and Mach 1 were likewise bound by the

same standards when they referred merchants to CardFlex and Wells Fargo and First Data. The standards required a due diligence review of prospective merchant-clients, including site inspections of their business premises.  Defendants were precluded from accepting merchant applications from merchants engaged in several unacceptable business practices including "Get Rich Quick Schemes."

33. To facilitate the opening and monitoring of merchant accounts, Defendants reviewed, verified, and then forwarded copies of the merchant application, contract, and supporting documents to Wells Fargo and First Data.

34. After CardFlex established a merchant-client's account, it maintained access to the data regarding that client's processing activities.  This access enabled CardFlex to view and monitor transaction activity for its merchant-client, including individual transaction details, as well as monthly and year-to-date summaries of overall transaction and chargeback counts and volume for each merchant account.

35. Beginning in 2009, Defendants first solicited and arranged to open merchant accounts for iWorks.

### DEFENDANTS' UNFAIR BUSINESS PRACTICES

**A.  Defendants Opened Hundreds Of Merchant Accounts For iWorks With Minimal Underwriting Based On A Personal Guarantee By Jeremy Johnson**

36. In 2009, iWorks began using the services of Blaze to find payment processing relationships so that it could continue to accept sales transactions from its deceptive websites.

37. During this time, iWorks' merchant accounts generated high chargeback rates and associated fees, and were repeatedly placed in the credit card associations' chargeback monitoring programs.  iWorks d/b/a's were first placed on the MATCH list in November 2006.  By June 2009, Jeremy Johnson had been placed on the MATCH list as the principal of

11

merchant accounts by four separate banks.  Most recently, Harris Bank had terminated 13 merchant accounts associated with Johnson on May 20, 2009.

38. In June 2009, after various other payment processors and merchant banks terminated their merchant accounts with iWorks, Blaze introduced iWorks' principal, Jeremy Johnson, to Andrew Phillips and John Blaugrund, principals of CardFlex.  Jeremy Johnson met with CardFlex to discuss obtaining merchant accounts for his companies.

39. In late June 2009, CardFlex began opening merchant accounts for iWorks.  Had Defendants performed the underwriting required by the agreement with Wells Fargo and First Data, Defendants would have learned at the outset of the business relationship with iWorks that both iWorks and its owner, Jeremy Johnson, had been placed on the MATCH list due to their long history of opening merchant accounts with high chargebacks.

40. When an ISO learns that a potential merchant-client like iWorks is on the MATCH list, this should be a red flag that, at a minimum, requires the ISO to exercise extreme caution in its business dealings with the merchant.  Indeed, many companies simply refuse to open accounts for merchants who have been placed on the MATCH list.

41. CardFlex not only decided to do business with iWorks, it also chose to loosen the underwriting requirements it applied to Jeremy Johnson's accounts.  On June 30, 2009, Andy Phillips emailed Jeremy Johnson a "personal guarantee" form that Johnson could execute and attach to any merchant application.  Under the guarantee, Johnson would be financially liable for any financial obligations that resulted from merchant accounts associated with him.

42. In a July 2, 2009 email, Johnson explained his understanding of the personal guarantee to other iWorks employees.  According to Johnson, CardFlex agreed to open "any

12

account in any name or corp we want" and they "wont need allot of financial info" (sic) as long as Johnson signed the guarantee.

43.  The personal guarantee fundamentally changed the nature of CardFlex's business relationship with iWorks.  Under CardFlex's agreement with Wells Fargo and First Data, CardFlex was compensated based on the volume of transactions that its clients processed.  Although this arrangement could incentivize CardFlex to recommend as many merchant-clients as possible, CardFlex was also contractually required to bear the financial risk associated with payment processing for its clients.  If CardFlex referred a client to Wells Fargo that was fined for high chargeback rates or was unable to refund consumers, CardFlex could be liable for those fines and refunds.  The "personal guarantee" CardFlex accepted placed the financial risk associated with iWorks accounts entirely on Jeremy Johnson's shoulders and removed the incentive for CardFlex to carefully underwrite and monitor iWorks' accounts.

44. In an August 21, 2009 email, the iWorks employee who was principally involved in overseeing their payment processing operations stated that CardFlex will set up merchant accounts with "basically 'no questions asked' (that is why we went with CardFlex)."

45. During this time, Blaze further facilitated iWorks' opening of numerous merchant accounts by submitting applications that it knew contained false information.  Blaze was contractually required to warrant to the best of its knowledge that the merchant applications it submitted were accurate.  The application requested, among other things, information about "Owners/Partners/Officers," "Other currently/previously owned businesses," and "Who Performs the Product/Service Fulfillment."  Blaze routinely concealed the affiliation between

13

the shell corporation and iWorks when it completed merchant applications on iWorks' behalf.

46. On July 9, 2009, for example, Jeremy Livingston signed a merchant processing agreement for a company called GGL Rewards, Inc. which purported to have 250 employees. Livingston left the "Other currently/previously owned businesses" and "Who Performs the Product Service Fulfilment" sections of the application blank.  Livingston also certified that he had inspected the business premises for GGL, and that the application was correct.  GGL Rewards was actually a shell company that did not have any employees.

47. Similarly, on July 15, 2009, Shane Fisher signed a merchant processing agreement for a company called Business Loan Success, Inc. which purported to have 180 employees.  Fisher wrote "NA" for "Other currently/previously owned businesses" and he left the "Who Performs the Product Service Fulfilment" section of the application blank. Fisher also certified that he has inspected the premises of Business Loan Success, and that the application was correct.  In fact, Business Loan Success was also a shell corporation without any employees.

48. On information and belief, neither Livingston nor Fisher actually inspected the premises of GGL Rewards or Business Loan Success, Inc.  These applications were forwarded to CardFlex and Wells Fargo, and the merchant accounts were opened.

**B.  iWorks Accounts Are Immediately Shut Down Due To High Charge Back Rates**

49. Immediately after it began processing transactions for iWorks accounts, Defendants learned that iWorks accounts had chargeback rates that would place the accounts on merchant monitoring lists and potentially subject the accounts to high fines and termination, if the chargeback rates continued.  On September 17, 2009, Andy Phillips

14

emailed Jeremy Johnson and Jeremy Livingston to thank them for a golfing trip to Pebble Beach, an exclusive resort.  In the email message, Phillips also told Johnson and Livingston that "everyone of your accounts is at 3% [chargeback rate] and above and this is month one." Phillips explained that the high chargeback rates could be because "nowhere [on the iWorks merchant website] does it even reference an on-going relationship."  Phillips also noted that the $39.95 fee only shows up on the bottom of the page and "if I weren't looking for it I never would have known I was going to be billed."

50. In his email, Phillips asked Johnson to follow-up so they could "implement corrections fast," but iWorks' chargeback rates would remain steady throughout its business relationship with CardFlex.

51. The next day, iWorks and Blaze had a meeting to discuss what iWorks described as "CardFlex issues."  One of the action items following the call was for iWorks to make changes to the billing descriptors that appeared on customer's credit card statements.  In a September 18, 2009 email that copied Shane Fisher, iWorks described its task as: "keeping the descriptor different enough so that Visa won't connect the dots, but keeping them similar enough so that the customer can connect the purchase with the charge."

52. The fact that every account Defendants had opened for iWorks had excessive chargebacks should have caused Defendants to cease doing business with Johnson, or to at least substantially reevaluate the terms of their relationship.  Instead, the pace at which Defendants opened processing accounts for iWorks in the name of various shell corporations only increased.  Over the next 3 months, between September 2009 and December 2009, Defendants would open more than 200 additional merchant accounts for iWorks.

15

53. In a single email on October 14, 2009, an iWorks employee emailed Blaze a request to open 75 merchant accounts.   The iWorks employee provided basic information such as the name of the corporation, the name under which it was doing business, the contact information, banking information, website, merchant descriptor, telephone number, articles of incorporation, and bylaws.  Blaze then completed the merchant applications and submitted them for approval.

54. On December 11, 2009, Shane Fisher emailed Jeremy Livingston and another Blaze employee to compliment them on the hard work they had done in securing iWorks' business.  Fisher noted that Blaze had completed scores of merchant applications in a single week.

55. In late 2009, merchant accounts that Defendants had opened for iWorks began to be shut down by the payment networks due to excessive chargeback rates.  Between November 11, 2009 and December 2, 2009, Wells Fargo and First Data shut down 14 of the merchant accounts Defendants opened for iWorks.  The accounts were shut down because they had chargeback rates exceeding 1% for three straight months.  Many of the accounts had chargebacks rates as high as 5% or 6%.

**C.  To Address High Chargeback Rates, CardFlex Advised iWorks To Begin Load Balancing Its Accounts To Evade Detection**

56. On December 2, 2009, Andy Phillips and Shane Fisher had a telephone call with iWorks principals to discuss what iWorks' Merchant Accounts Manager described as "processing issues and their potential long term impact."  Five days later, on December 7, 2009, an iWorks employee emailed CardFlex's Technical Operations department to discuss how they would "implement load balancing."

57. Load balancing refers to the practice of allocating sales volume across multiple merchant accounts.   There may be legitimate reasons for a merchant to divide sales transactions between multiple accounts.  For example, a merchant may wish to divide its payment processing between multiple banks in order to obtain more favorable rates based on the merchant's contract with its banks.

58. Load balancing also may be used to avoid triggering the thresholds for the chargeback monitoring programs.  Because the Visa and MasterCard merchant monitoring programs require at least 100 total transactions per month, merchants could divide their transactions among multiple merchant accounts in order to keep their total number of transactions artificially below the monitoring thresholds.

59.   The use of load balancing to avoid the minimum sales thresholds required for chargeback monitoring programs or to otherwise evade detection by monitory programs serves no legitimate business purpose.

60. On December 22, 2009, Shane Fisher emailed Andy Phillips and John Blaugrund to summarize a call with iWorks.  In his email, Fisher explained that iWorks had called an internal meeting to discuss implementing Andy Phillips' suggestion that iWorks consider having a single employee work on "load balancing full time."  Fisher also explained that iWorks was trying to implement Andy Phillips' other suggestion of "obtaining multiple signers for each corporation" instead of using the same five to six "signers" for all of its corporations.

61. CardFlex not only recommended that iWorks begin load balancing, but in December 2009, it actually provided the technical means by which iWorks could load balance its accounts.  To use the system, iWorks simply had to check a box titled "Enable

17

Load Balancing for Credit Cards" and then enter the accounts that would be included in the balancing and the maximum value of transactions that could be processed through each account per month.

62. As a CardFlex employee explained, the system would process sales on the default account until the monthly sales limit was reached, then it would process sales on the next account until the monthly sales limit was reached, and it would continue cycling through accounts until all of the sales limits had been reached.  At that point, the system would return to processing on the initial account until the actual account limit was reached.

63. The system CardFlex presented had the sole capability of artificially limiting the sales volume on a particular merchant account.   If implemented correctly, the system CardFlex provided could guarantee that iWorks merchant accounts would not process enough transactions to qualify for placement in merchant monitoring programs and thus, presumably, would not be terminated.

64. Moreover, Defendants and iWorks did not even face the additional burdens in underwriting and approving the new accounts that were created in order to load balance iWorks transactions.  Because, as Jeremy Johnson explained, CardFlex was willing to open "any account in any name or corp we want," and Blaze was willing to fill out and sign merchant applications that it knew contained false information, iWorks had no difficulty opening as many new accounts as it needed to implement load balancing without affecting its sales volume.

65. The load balancing system created by CardFlex in December 2009 was not immediately implemented because it was not sophisticated enough to account for the complexity of iWorks' scheme.  In December 2009, iWorks was deceptively billing

18

consumers through numerous shell corporations and hundreds of merchant accounts. iWorks employees asked CardFlex if the system CardFlex had designed could use "sticky transactions." Sticky transactions meant that every time a consumer was charged on a monthly basis as part of a negative option program, the consumer's charge would come from the same account and with the same billing descriptor. Charging a consumer with varying billing descriptors increased the chances that consumers would protest the charge. CardFlex responded that such a capability was not built into the system.

66. It took several months before this capacity was built into the system. On February 22, 2010, iWorks sent CardFlex a list of accounts for which CardFlex implemented automated load balancing. By that time, the staggering amount of chargebacks iWorks accounts had accrued was simply too large to avoid detection by Wells Fargo, Visa, and MasterCard.

**D. Defendants Continued To Process Accounts For iWorks Even After Visa And MasterCard Began Stopping Merchants Engaged in Negative Option Billing**

67. On December 28, 2009, shortly after CardFlex first proposed to iWorks that it begin load balancing, Visa issued a press release regarding the shut down of 100 merchant accounts that were engaged in selling free trial offers with hidden recurring negative options. The next day, on December 29, 2009, a MasterCard employee informed CardFlex directly that MasterCard would be terminating three merchant accounts. MasterCard warned CardFlex that it would vigorously enforce its rules regarding deceptive marketing practices in internet marketing.

68. On January 4, 2010 CardFlex emailed iWorks and other clients engaged in negative option marketing. CardFlex warned of industry changes and stated that it would be reviewing portfolios of clients engaged in negative option sales. Later that week, on January

19

12, 2010, Jeremy Johnson visited CardFlex's office.  The next day, CardFlex suspended

processing on all iWorks accounts until the accounts could be reviewed.  Over the next

several days, CardFlex employees requested that iWorks make some changes to the language

on iWorks' merchant websites.  On January 15, 2010, and again on January 27, 2010,

CardFlex approved batches of iWorks accounts to resume processing.  The chargeback ratios

on iWorks accounts processed by CardFlex did not improve after January 2010.

69. On February 5, 2010, Jeremy Johnson let Andy Phillips use his private jet for a

family ski trip free of charge.

**E.  As iWorks Accounts Were Shut Down, Defendants Permitted iWorks To Continue
To Process Transactions For The Same Consumers By Opening New "Legacy
Accounts"**

70. As iWorks merchant accounts began to be shut down due to excessive

chargebacks, Defendants did not cease processing charges to all customers of a particular

merchant account that was shutdown.  Instead, Defendants simply transferred the customers

of a shutdown merchant account to a different merchant account that was still operational, so

that iWorks could continue its negative option billing.  Defendants and iWorks used the term

"legacy account" to refer to a particular customer whose account continued to be billed even

after the payment processing account under which the customer was initially enrolled was

shut down.

71. On January 8, 2010, Shane Fisher emailed Andy Phillips to let him know that

iWorks accounts with Global Payments, a separate payment processor, were going to be shut

down on January 30, 2010.  Fisher told Phillips that the "legacy accounts" were "vital to

iWorks to say the least" and he asked if they could have new accounts in place with CardFlex

to process transactions before the Global Payments accounts were shut down.

72. On January 29, 2010, CardFlex notified iWorks that it had obtained Wells Fargo's approval to begin processing the exact same merchant accounts that had been shut down by Global Payments.

73. On February 5, 2010, CardFlex notified iWorks that 11 applications for "legacy accounts" had been approved and would begin processing that day.  On March 10, 2010, CardFlex approved additional "legacy accounts" for processing.

**F.  Defendants Continued to Provide Payment Processing Services For iWorks Until They Were Forced To Stop By Wells Fargo And First Data**

74. By spring of 2010, iWorks transactions were being processed through an array of shell companies.  When accounts were closed due to high chargebacks, recurring charges continued to be processed as "legacy billing" as new accounts were quickly opened.

75. On March 12, 2010, Loyd Johnston, iWorks' account manager, emailed Shane Fisher and Jeremy Livingston a copy of iWorks' "Merchant Charts."  Johnston joked that this was why he was "losing all [of his] hair."  The Merchant Charts showed the complexity of Defendants' payment processing operations for iWorks.  The Merchant Chart contained 22 pages of flow charts showing payment processing accounts divided by the type of scam, and whether the account was closed, currently processing, legacy processing, or new/pending processing.  For example, for the government grant scam alone, the chart showed that iWorks had 17 closed accounts, 6 accounts that were currently processing, 2 dedicated to legacy processing, and more than 50 accounts that were ready to begin processing once iWorks needed them, i.e., as its current accounts were shut down.

76. The system Defendants had devised was successful at providing iWorks access to the payment systems, and ensuring that its scams continued.  Defendants' conduct was brought to an end only when First Data and Wells Fargo intervened.  On April 13, 2010, First

Data set up a meeting between CardFlex and Wells Fargo.  Wells Fargo requested that CardFlex describe its underwriting process, risk monitoring process, and methodology for handling merchant accounts with high chargebacks.  Wells Fargo also identified nearly 30 accounts it wanted CardFlex  to discuss in more detail.  Many of these accounts were iWorks accounts.

77. On April 14, 2010, Andy Phillips met with representatives of Wells Fargo and First Data to address their concerns.  During the meeting, Phillips claimed that CardFlex's policy was to not accept accounts from merchants who engage in deceptive marketing practices. Phillips also claimed that CardFlex "terminate[s] merchants who attempt to load balance."

78. On April 22, 2010, CardFlex emailed iWorks and notified it that all of its accounts would be closed the next day.  CardFlex forwarded the message to First Data.  On April 28, 2010, a First Data interoffice memorandum summarized CardFlex's total merchant processing portfolio.  First Data determined that through March 31, 2010, CardFlex had processed more than $387 Million in credit card volume and with an overall chargeback ratio of 3.34%.

79. On June 2, 2010, Wells Fargo notified CardFlex that it would be terminating its entire relationship with CardFlex.

80. Even after Wells Fargo notified CardFlex that it would be terminating its relationship with CardFlex, Defendants still pursued future business activities with iWorks. Through November 2010, Andy Phillips, John Blaugrund, Jeremy Livingston, Shane Fisher, and Jeremy Johnson, negotiated the terms of an agreement to process payments through the Automated Clearing House ("ACH") network.  The ACH network is a payment processing

system that permits the electronic transmission of payments between financial institutions. The ACH network operates independently of the Visa and MasterCard payment networks.

81.  CardFlex is currently processing merchant accounts through other acquiring banks.

82. On information and belief, Blaze is no longer acting as a sales agent for CardFlex.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

83. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."  Acts or practices are unfair under Section 5 of the FTC Act if (1) they cause substantial injury to consumers; (2) consumers cannot reasonably avoid injury themselves; and (3) the injury is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT ONE

84. As described in Paragraphs 36-82 of this Complaint, Defendants:

    A.  Submitted applications for and opened hundreds of merchant accounts based on false information in shell corporation names for iWorks;

    B.  Relied on a personal guarantee by Jeremy Johnson instead of performing underwriting;

    C.  Advised iWorks to begin load balancing, and implemented a system by which iWorks could load balance; or

    D.  Ignored excessive chargeback rates on iWorks accounts.

85. The acts or practices described in paragraph 84, individually or in combination, caused tens of millions of dollars of unauthorized charges on consumers' credit cards. Defendants' acts or practices therefore caused consumers substantial injury that was not

reasonably avoidable by consumers themselves and was not outweighed by countervailing benefits to consumers or competition.

86. Accordingly, Defendants' acts or practices as alleged in this Complaint constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n).

### CONSUMER INJURY

87. Consumers throughout the United States have suffered substantial injury as a result of the Defendants' violations of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts and practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

### THE COURT'S POWER TO GRANT RELIEF

88. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

### PRAYER FOR RELIEF

89. Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

    A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

B.  Enter a permanent injunction to prevent future violations of the FTC Act by
Defendants;

C.  Award such relief as the Court finds necessary to redress injury to consumers
resulting from Defendants' violations of the FTC Act, including but not
limited to, rescission or reformation of contracts, restitution, the refund of
monies paid, and the disgorgement of ill-gotten monies; and

D.  Award Plaintiff the costs of bringing this action, as well as such other and
additional relief as the Court may determine to be just and proper.

Respectfully submitted,

JONATHAN E. NUECHTERLEIN

FEDERAL TRADE COMMISSION

General Counsel

Dated:  July 30, 2014                                    /s/ Benjamin R. Davidson

BENJAMIN R. DAVIDSON (DC Bar No. 975509)
bdavidson@ftc.gov
KAREN S. HOBBS (DC Bar No. 469817)
khobbs@ftc.gov
Federal Trade Commission
600 Pennsylvania Avenue, NW, H-286
Washington, DC 20580
202-326-3055 (Davidson)
202-326-3587 (Hobbs)
202-326-3395 (Fax)

BLAINE T. WELSH
blaine.welsh@usdoj.gov
Assistant United States Attorney
Nevada Bar No. 4790
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV 89101
702-388-6336
702-388-6787 (Fax)

Attorneys for Plaintiff
Federal Trade Commission

26