Benjamin R. Davidson (DC Bar No. 975509)
Karen S. Hobbs (DC Bar No. 469817)
Federal Trade Commission
600 Pennsylvania Ave., NW, Mailstop CC-8528
Washington, DC 20580
(202) 326-3055 / bdavidson@ftc.gov
(202) 326-3587 / khobbs@ftc.gov
(202) 326-3395 (fax)

Attorneys for Plaintiff
Federal Trade Commission


Blaine T. Welsh (Nev. Bar No. 4790)
Assistant United States Attorney
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV 89101
(702-388-6336) / blaine.welsh@usdoj.gov
702-388-6787 (fax)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| **Federal Trade Commission**, <br><br> Plaintiff, <br><br> vs. <br><br> **CardFlex, Inc., et al.**   Defendants. | No. 3:14-cv-397-MMD-GWF <br><br> RESPONSE IN OPPOSITION TO MOTION TO DISMISS |

Plaintiff Federal Trade Commission ("FTC") alleges that CardFlex Inc., Andrew M. Phillips and John S. Blaugrund's ("CardFlex") engaged in unfair conduct because CardFlex designed and implemented a strategy to open and keep open merchant accounts for an entity engaged in fraud, iWorks, even though these merchant accounts generated chargebacks at rates that would normally require the accounts to be terminated. The complaint also alleges that John S. Blaugrund ("Blaugrund") is liable for CardFlex's acts because he actively participated in and had the authority to control CardFlex. CardFlex's Motion to Dismiss should be denied because it requires the court either to disregard the complaint's well-plead allegations or disregard recent Ninth Circuit decisions finding payment processors who engaged in conduct similar to CardFlex liable under the FTC Act. Also, the Court should deny CardFlex's attempt to delay adjudication of the FTC's claims against it. Specifically, CardFlex's motion to stay should be denied because

the requested stay is one of indefinite length, and CardFlex has not met its burden of demonstrating the balance of harms favors a stay.

## I. Statement of Facts

CardFlex is an Independent Sales Organization ("ISO") that provides payment processing services to merchants. Complaint, Docket Entry #1. at ¶ 17 ("Compl."). In late June 2009, CardFlex began opening merchant accounts used to process payments for iWorks. *Id.* at ¶ 39. At the time CardFlex began its business relationship with iWorks, iWorks and its d/b/a's had previously generated excessive chargebacks[1] warranting the termination of merchant accounts and listing on the MasterCard Member Alert to Control High-risk Merchants ("MATCH") database by several acquiring banks. *Id.* at ¶ 37. CardFlex chose to open merchant accounts for iWorks notwithstanding iWorks' established record of generating excessive chargebacks. *Id.* at ¶ 39. CardFlex's ISO agreement with Wells Fargo bank required CardFlex to conduct diligent underwriting on its merchant clients. *Id.* at ¶ 32. However, when it opened accounts for iWorks, CardFlex did not meaningfully underwrite the accounts. *Id.* at ¶¶ 41-42. Instead, CardFlex relied on a personal guarantee signed by iWork's principal Jeremy Johnson. *Id.* According to iWorks, CardFlex was willing to open merchant accounts with "basically 'no questions asked.'" *Id.* at ¶ 44.

The payment processing accounts CardFlex opened for iWorks immediately generated chargeback rates at levels that could result in high fines and termination of the merchant accounts. *Id.* at ¶ 49. On September 19, 2009, CardFlex told iWorks that these high chargeback rates were due to the fact that iWorks' websites did not adequately disclose the up-front and monthly fees it charged consumers. *Id.* at ¶ 49. In fact, the FTC later sued iWorks for engaging in these deceptive practices. *Id.* at ¶ 25. iWorks' chargeback rates would remain steady throughout its business relationship with CardFlex. *Id.* at ¶ 50.

In late 2009, the payment networks began to shut down iWorks accounts due to their high chargeback rates. *Id.* at ¶ 55. CardFlex then designed and implemented a strategy to keep

---

[1] A chargeback occurs when customers contact their credit card issuing bank to dispute a charge appearing on their credit card statement. *Id.* at ¶ 27.

iWorks' merchant accounts open even though iWorks' accounts generated chargebacks at rates that would normally require the accounts to be terminated. This strategy had several parts.

First, CardFlex opened a large number of merchant accounts for iWorks and its d/b/a's. When accounts were closed due to excessive chargebacks, CardFlex simply opened new accounts to replace the accounts that were shut down. *Id.* at ¶ 74. During the course of its business relationship with iWorks, CardFlex opened at least 293 merchant accounts for iWorks. *Id.* at ¶ 26.

Second, CardFlex opened accounts in the name of shell corporations to conceal the fact that they were iWorks' accounts. CardFlex opened processing accounts in the name of at least 30 separate shell corporations. *Id.* at ¶ 26. CardFlex also recommended to iWorks that it use "multiple signers" for each shell corporation instead of using the same names repeatedly on each of its shell corporations. *Id.* at ¶ 60.

Third, CardFlex provided iWorks with a system to avoid triggering scrutiny from the payment networks' merchant monitoring programs. *Id.* at ¶¶ 60-63. The payment network monitoring programs only scrutinize merchants with at least 100 total transactions per month. *Id.* at ¶ 58. CardFlex recommended that iWorks divide its transactions among its various merchant accounts in order to keep the number of transactions on any given account low enough to avoid monitoring from the payment networks.[2] *Id.* at ¶ 60. CardFlex also provided iWorks the technical means to load balance its accounts. *Id.* at ¶ 61. To use the system, iWorks simply had to check a box titled "Enable Load Balancing," designate the accounts to be balanced, and select the maximum volume of sales per account in a given month. *Id.*

Fourth, when accounts were shut down due to excessive chargebacks, CardFlex did not cease processing charges to the customers of those particular merchant accounts. *Id.* at ¶ 70. Instead, it transferred those customers to new merchant accounts so that iWorks could continue charging them. *Id.*

---

[2] This process is known as "load balancing."

3

Using this elaborate plan, CardFlex was able to process more than $26 million in consumer payments for iWorks accounts before Wells Fargo bank terminated its contract with CardFlex. *Id.* at ¶¶ 14, 79.

**II.     Legal Standard**

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007)). "Detailed factual allegations" are not required. *Id.* Evaluating whether a complaint should be dismissed is a two-step process. First, the well-pleaded factual allegations in the complaint are accepted as true. *Id.* at 679. Second, the court considers whether the factual allegations state a plausible claim for relief. *Id.* A claim is plausible on its face when the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* There is no "probability requirement" though a complaint must demonstrate more than a "sheer possibility" that the defendant acted unlawfully. *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. at 678).

**III.    The FTC Has Stated a Claim that CardFlex Engaged in Unfair Practices**

The FTC charged CardFlex with a single count of engaging in unfair practices.[3] Compl. at ¶¶ 84-86. An act is unfair if it "[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition." *FTC v. Neovi*, 604 F.3d 1150, 1155 (9th Cir. 2010), as amended (June 15, 2010), *amended* 09-55093, 2010 WL 2365956 (9th Cir. June 15, 2010) (citing 15 U.S.C. §45(n)). CardFlex does not dispute that the FTC's complaint sufficiently alleges the second and third elements of unfairness – that the injury is not reasonably

---

[3] Much of CardFlex's Motion to Dismiss attempts to establish that CardFlex is not liable under theories of "aiding and abetting" or "means and instrumentalities." The FTC's complaint does not allege that Cardflex violated the FTC Act based on either theory. The two-step process for evaluating whether a complaint should survive a motion to dismiss does not involve testing the complaint's allegations under legal theories that are not actually alleged as part of the complaint.

4

avoidable by consumers and is not outweighed by countervailing benefits. The only issue raised by CardFlex's Motion to Dismiss is whether CardFlex's conduct caused substantial injury to consumers.

### A. Like the Payment Processors in *Neovi* and *Wells*, the FTC has Alleged that CardFlex Caused Substantial Injury

The Ninth Circuit has twice found that payment processors are liable for causing consumer injury when the payment processors "engaged in a practice that facilitated and provided substantial assistance to. . . deceptive schemes." *Neovi* 604 F.3d at 1157; *See also FTC v. Wells*, No. 09-16179, 385 Fed.Appx. 712, 713 (9th Cir. June 28, 2010) (finding that a payment processor engaged in an unfair practice by "[c]arrying out unauthorized transactions"). CardFlex's multi-step plan to provide iWorks unfettered access to the payment networks is exactly the sort of practice that establishes unfairness liability under the Ninth Circuit's decisions in *Neovi* and *Wells*.

First, in *Neovi*, the Ninth Circuit affirmed a summary judgment decision finding that a payment processor called Qchex engaged in unfair practices that violated Section 5 of the FTC Act. 604 F.3d at 1150. Qchex operated an online payments system that allowed users to create an account by supplying their email address and bank account information, and permitted users to write checks from their Qchex account that could be either delivered online or printed and mailed to the payee. *Id.* at 1153. Qchex initially did little to verify that the bank accounts actually belonged to the users who were drawing payments from those accounts. *Id.* at 1154. As a result, "unscrupulous opportunists" began obtaining identification information from unwitting third parties and drawing checks from the third parties' bank accounts without their authorization. *Id.* Qchex was not alleged to have been one of the "unscrupulous opportunists" who withdrew money from accounts without authorization; rather, the complaint alleged that Qchex's payment system lacked sufficient protections to keep out these perpetrators of unauthorized withdrawals. *Id.*

Qchex advanced a number of unsuccessful factual and legal arguments to defend itself from liability. Factually, Qchex claimed that it took active steps to reduce fraud in its system such as freezing accounts for fraud, monitoring the system for irregular activity, and blacklisting

certain IP addresses – measures the court found ineffective. *Id.* at 1154. Legally, Qchex argued that it did not cause consumer injury because it was the users of its system, not Qchex, who actually created the checks resulting in unauthorized withdrawals. *Id.* at 1155. Like CardFlex, Qchex also argued that aiding and abetting is not a viable theory under the FTC Act. *Id.* at 1157. The Ninth Circuit rejected Qchex's arguments and found Qchex liable for causing substantial consumer injury because Qchex "engaged in a practice that facilitated and provided substantial assistance to a multitude of deceptive schemes." *Id.* The Ninth Circuit also expressly declined to take a position on whether aiding and abetting liability under the FTC Act was viable. 604 F.3d at 1157, n.5. Instead, the court stressed that because Qchex engaged in conduct that was "*itself* injurious to consumers" Qchex was directly liable under the FTC Act even if it business practices assisted others in their deceptive schemes. *Id.* at 1157.

Second, in *Wells*, the Ninth Circuit affirmed a summary judgment ruling against another payment processor, Nevada-based InterBill Ltd., and its principal Thomas Wells (collectively "InterBill"). 385 Fed.Appx. at 713. According to the FTC's complaint, InterBill processed remotely created checks (unsigned checks also referred to as "demand drafts") through Wells Fargo Bank for a company called Pharmacycards. Compl. at ¶¶ 8-10, *FTC v. Interbill, Ltd.*, 06-cv-1644-JCM-PAL (D. Nev. Dec. 26, 2006).[4] Pharmacycards purported to be a telemarketing business that sold prescription discount cards to consumers, but in reality, it assembled a large list of bank account numbers that it attempted to debit. *Id.* Here too, the Commission's complaint contained no allegations that the payment processor itself directly interacted with the consumer victims. The Ninth Circuit affirmed the district court's summary judgment ruling because the payment processors "facilitate[d] or contribute[d] to ill-intentioned schemes" in which "injury was a predictable consequence." 385 Fed. Appx. at 713 (citing *Neovi*, 604 F.3d at 1156). More specifically, the payment processor defendants failed to conduct reasonable due diligence, did not respond when the fulfillment materials did not match the program description,

---

[4] The complaint is cited because it contains the most detailed factual description of the defendants' alleged misconduct.

6

and did not respond when the chargeback rates were at 10 to 20 times the rates "generally permitted." *Id.*

A similar result was reached in *FTC v. Windward Marketing*, 1:96-cv-615, 1997 WL 33642380, at *12 (N.D. Ga. Sept. 30. 1997), a case the Ninth Circuit described as "instructive insofar as [it] illustrate[s] the role of a facilitator under the FTC Act." *Neovi*, 604 F.3d at 1157. In *Windward Marketing*, the payment processor defendants were found to have engaged in unfair conduct when they deposited unauthorized bank drafts into bank accounts the payment processors opened in the name of various fictitious magazines. The payment processor's clients called consumers and told them they had won a sweepstakes and free magazine subscriptions, and the consumers needed to provide their bank account information for verification purposes in order to receive their prizes. 1997 WL 33642380 at *1-2. The clients then provided the payment processor with a list of supposedly verified orders, and the payment processor withdrew the charges from the consumers' accounts. *Id.* at *3. The payment processor in *Windward Marketing* did not initiate the scheme or interact with consumers. *Id.* The payment processor also claimed that it relied on the telemarketer's assurances that the payments it processed were all authorized. *Id.* at *12. The court found that the payment processor ignored warning signs such as 40% return rates, contact from government investigators, and a bank closing its accounts with the payment processor. *Id.* The court granted the FTC's summary judgment motion and concluded that the payment processor was liable because it "facilitated and provided substantial assistance" to the deceptive scheme. *Id.* at *12.

The FTC has stated a plausible claim that CardFlex's conduct falls squarely within the bounds of unfair conduct, as defined by the FTC Act and as interpreted by other courts who have evaluated the conduct of payment processors in *Neovi*, *Wells*, and *Windward Marketing*. In many ways, CardFlex's conduct was worse than the conduct of the payment processors in *Neovi*, *Wells*, and *Windward Marketing*.[5] The payment processor in *Neovi* implemented anti-fraud measures,

---

[5] In its reply, CardFlex may attempt to distinguish *Neovi*, *Wells*, and *Windward Marketing* with further factual disputes. At this stage in the litigation, "detailed factual allegations" are not required. *Ashcroft* 556 U.S. at 678. The FTC's complaint need only provide "factual content, and reasonable inferences from that content" that are "plausibly suggestive of a claim entitling the plaintiff to relief." *Moss* 572 F.3d at 969.

7

1 while CardFlex took active steps, like the use of shell corporations and load balancing, to
2 conceal iWorks' activity from anti-fraud measures implemented by the credit card networks. The
3 payment processor in *Wells* was found to have ignored clear warning signs that its client engaged
4 in unauthorized transactions, and the payment processor in *Windward Marketing* relied on empty
5 assurances from its client that the payments it processed were authorized. By contrast, CardFlex
6 recognized at the very beginning of its relationship with iWorks that iWorks' excessive
7 chargebacks were due to poor disclosures on iWorks' websites. Compl. at ¶ 49. CardFlex
8 responded by implementing a strategy to keep iWorks' merchant accounts open notwithstanding
9 their high chargeback rates. This strategy would not have been necessary if CardFlex believed
10 that iWorks' business could be operated in ways that did not generate excessive chargebacks.

>
> **B.     CardFlex's Arguments to the Contrary Either Reject the Applicable Ninth Circuit Law or Require Disregarding the Well-Pled Allegations in the Complaint**

CardFlex argues that its conduct did not cause substantial injury to consumers for a variety of reasons. These arguments require either rejecting the Ninth Circuit's decisions in *Neovi* and *Wells* or disregarding the well-pled allegations in the FTC's complaint.

First, CardFlex argues that any harm would have been "caused exclusively by iWorks and its allegedly unscrupulous businesses practices" because CardFlex "had no direct contact with consumers so as to cause them substantial injury," and the services CardFlex provided were no more the cause of injury than the services provided by iWorks' electricity provider.[6] Mot. to Dismiss at 6. Factually, this argument disregards the well-pled allegations in the complaint. CardFlex did not passively provide iWorks with payment processing services like a telephone provider or electricity provider. Rather, CardFlex designed and implemented the strategy to keep iWorks' accounts open notwithstanding their chargeback rates.

Legally, this argument rejects the Ninth Circuit's reasoning in *Neovi* and *Wells*. In both cases, the Ninth Circuit found that payment processors caused substantial injury even though the processors did not directly interact with consumers, and instead, provided payment processing

---

[6] CardFlex does not cite any legal authority for this argument.

8

services to separate third parties that interacted with consumers directly. As the Ninth Circuit explained in *Neovi*, CardFlex's argument that it did not directly interact with consumers could "at most" demonstrate "that both the payment processor and the payment processor's client contributed to the misconduct." *Id.* at 1155. This would not provide CardFlex a defense because "a single violation of the [FTC] Act may have more than one perpetrator." *Id.*

Second, CardFlex argues that unlike the defendant in *Neovi*, it did not "create the tools allegedly used to harm consumers." Mot. to Dismiss at 8. This argument is at odds with the Ninth Circuit's observation that more than one entity can contribute to misconduct. *Neovi* at 1155. Indeed, payment processors have been found liable for unfair conduct under the FTC Act when they process payments through tools they did not create. The payment processor in *Windward Marketing* used bank drafts, a tool it did not create, to process payments. 1997 WL 33642380, at *3. Similarly, in *Wells*, the payment processor processed consumer payments by depositing remotely created checks or demand drafts into a designated account with Wells Fargo Bank. Compl. at ¶ 10, *FTC v. Wells*, No. 09-16179. Furthermore, the FTC alleges that CardFlex created and implemented the multi-step plan that kept iWorks' accounts open even though the accounts generated chargeback rates at levels that would normally require the accounts to be closed. This plan is a tool, created by CardFlex, that harmed consumers because it gave iWorks the ability to continue accepting payments from the victims of its scam.

Third, CardFlex argues that in *Neovi*, the FTC presented evidence that Qchex knew a large percentage of the checks being created were likely fraudulent. Mot. to Dismiss at 7. The FTC complaint alleges that at the very beginning of its business relationship with iWorks, CardFlex recognized that every iWorks account had excessive chargeback rates, and the chargebacks were due to poor disclosures on the iWorks' website. Compl. at ¶ 49. The complaint also alleges that iWorks' chargeback rates never improved. *Id.* at ¶ 50. At the very least, these allegations support the inference that CardFlex also knew that iWorks' sales were likely fraudulent.

Fourth, CardFlex argues that unlike the defendant in *Neovi*, its conduct was "not central to the iWorks scheme" because CardFlex "simply referred iWorks to a merchant bank and

9

payment processor that could process Visa and MasterCard transactions," and the transactions at issue had "already been initiated through the numerous iWorks websites."[7] Mot. to Dismiss at 8. Again, this argument is factually and legally insufficient to support dismissal of the complaint. Factually, the complaint alleges that CardFlex did far more than merely refer iWorks to merchant banks. CardFlex took active steps to conceal the nature of iWorks' activity from those banks. Legally, CardFlex's actions are akin to those of the payment processors held liable for FTC Act violations in *Wells*, *Neovi,* and *Windward Marketing*: they all processed payments for third parties who interacted with consumers directly.

### IV. The Complaint Sufficiently Alleges John Blaugrund's Liability for Violations of the FTC Act

Citing exclusively to cases decided on summary judgment or at the conclusion of trial, CardFlex argues that the complaint fails to allege facts sufficient to hold Blaugrund liable for violations of the FTC Act. This motion should be denied because the FTC's allegations against Blaugrund are more than sufficient.

Individual defendants may be found liable for both permanent injunctive relief and monetary relief, based on a corporate defendant's violations of the FTC Act. To establish the liability of an individual defendant for permanent injunctive relief at trial, the FTC must prove that the individual participated directly in the acts or practices or had the authority to control the company involved in the unlawful practices. *Neovi,* 598 F. Supp. 2d at 1116 (citing *FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176, 1203-04 (C.D. Cal. 2000); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997)). To obtain monetary relief, the FTC must additionally show that the individual had knowledge of the acts or practices. *Id.* (citing *Publ'g Clearing House*, 104 F.3d at 1171). The knowledge requirement may be satisfied by showing the individual had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional

---

[7] CardFlex also claims that it was "one of several payment processors that the iWorks scheme used." Mot. to Dismiss at 8. The only other payment processors referenced in the complaint are payment processors that shut down their accounts with iWorks either before or during CardFlex's business relationship with iWorks. Compl. at ¶¶ 38, 71.

avoidance of the truth." *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (upholding summary judgment imposing liability for injunctive and monetary relief against individual defendant for his role in deceptive telemarketing scheme); *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 574 (7th Cir. 1989) (citing *FTC v. Kitco of Nevada, Inc.,* 612 F. Supp. 1282, 1292 (D. Minn. 1985) (same, upholding trial court ruling).

The complaint states a plausible claim that Blaugrund is liable for both permanent injunctive relief and monetary relief. First, the complaint alleges Blaugrund is an officer and director of CardFlex. Compl. at ¶ 10. Second, the complaint alleges Blaugrund, "acting alone or in concert with others, [ ] has formulated, directed, controlled, or participated in the acts and practices" at issue in the complaint. *Id.* Third, the complaint categorizes the named defendants based on their function in the alleged scheme, setting forth in detail the specific acts and practices in which CardFlex, Andrew Phillips, and Blaugrund, collectively engaged. The complaint uses "CardFlex" to refer to CardFlex, Inc., Andrew Phillips, and John Blaugrund collectively. *Id.* at ¶ 17. The complaint also defines the term "Defendants" to mean the individual and corporate defendants collectively. *Id.* at ¶ 1.

Finally, the complaint includes additional, but not required, illustrations of Blaugrund's participation in the unfair conduct, including the following facts:

- Blaugrund was included on an email confirming that "iWorks was trying to implement Andy Phillips' other suggestion of 'obtaining multiple signers for each corporation' instead of using the same five to six 'signers' for all of its corporations" (*Id.* at ¶ 58);

- Despite the termination of iWorks merchant accounts, and Wells Fargo's termination of its relationship with CardFlex, Inc., Blaugrund, together with the other named individual defendants and Jeremy Johnson, "negotiated the terms of an agreement to process payments through the Automated Clearinghouse ("ACH") network" (*Id.* at ¶¶ 76, 78).

Courts have repeatedly held that where the Commission alleges an individual defendant had authority to direct, control, and participated in the activities alleged to have been carried out by the defendant companies, of which he is an officer, it has sufficiently stated a claim for relief. In *FTC v. Ivy Capital, Inc.,* No. 2:11-cv-283 JCM (GWF), 2011 WL 2118626 (D. Nev. May 25,

2011), the Commission alleged the individual defendants formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in the complaint and outlined individual defendants' involvement in the corporate defendant or its associated entities. The court denied the individual defendants' motion to dismiss, finding these allegations were sufficient to state a claim for both injunctive and monetary relief. *Id.* at *5. *See also, e.g. FTC v. Ideal Fin. Solutions, Inc.,* No. 2:13-cv-143-JAD-GWF, 2014 WL 2565688 at *3 (D. Nev. June 5, 2014) (denying the individual defendants' motion to dismiss, finding sufficient the complaint's allegations that the individuals were officers of the closely held corporate defendants that were alleged to have participated in the scheme); *FTC v. Subscriberbase Holdings, Inc.*, No. 13-cv-1527, 2013 WL 5406225 at *1-2 (N.D. Ill. Sept. 24, 2013) (denying individual defendant's motion to dismiss where complaint identified him as an officer and manager of the corporate defendants); and *FTC v. Commerce Planet, Inc.,* No. 09-1324 (C.D. Cal. Feb. 12, 2010) (minute order denying a motion to dismiss where the complaint alleged that individual defendant was the president and director of the company that owned and operated the allegedly deceptive website).

Similarly, in *FTC v. Sterling Precious Metals, LLC*, No. 12-cv-80597, 2013 WL 595713 at *4 (S.D. Fla. Feb. 15, 2013), the court considered "the allegations pertaining to the defendants as a whole" in denying the individual defendant's motion to dismiss. The court aptly noted that such allegations "provide the context that allows this Court to understand and weigh the significance of the FTC's claims that [the individual defendant] formulated, directed, controlled, had the authority to control, or participated in the acts and practices of [corporate defendants] that violate the FTCA . . ." *Id. See also, FTC v. AMG Services, Inc.,* No. 2:12-cv-00536-GMN-VCF, 2012 WL 6800525 at *7 (D. Nev. Nov. 1, 2012) (citing *Ivy*, 2011 WL 2118626) (denying individual defendant's motion to dismiss where the complaint categorized the roles of the defendants and outlined the alleged scheme in sufficient detail to put individual on notice).

CardFlex cites three cases in support of the broad proposition that Blaugrund's position as an officer or director of CardFlex, Inc., alone, is insufficient to satisfy the control or participation element of individual liability. Movants' Mot. Dismiss at 10. These cases are inapposite. First, as noted above, the Commission's complaint alleges facts in addition to

1  Blaugrund's corporate position. Second, unlike the authority cited above, the cases cited by
2  CardFlex were decided in the context of bench trials and summary judgment motions, not
3  motions to dismiss. For example, in *FTC v. QT, Inc.,* 448 F. Supp. 2d 908, 973 (N.D. Ill. 2006),
4  the court conducted a seven-day bench trial before determining the Commission had failed to
5  present evidence of the individual defendant's requisite participation in or authority to control
6  and knowledge of the deceptive acts or practices of the corporate defendants. In *FTC v. J.K.*
7  *Publications*, 99 F. Supp. 2d 1176, 1207-09 (C.D. Cal. 2000), the court ruled on summary
8  judgment in favor of an individual defendant who presented evidence that he did not "even
9  [know] any of the other defendants (or their agents) or communicated in any way with any of
10 other defendants (or their agents)." Likewise, in *Flotill Products, Inc. v. FTC*, 358 F.2d 224, 233
11 (9th Cir. 1966) *rev'd on other grounds*, 389 U.S. 179 (1967) there was a full administrative
12 hearing before the Commission which adduced no evidence that the individual petitioners
13 personally violated the Clayton Act. The individual defendants in these cases all went to trial or
14 summary judgment, where evidence of their roles was presented and weighed. Here, too, the
15 FTC has alleged sufficient facts to put Blaugrund on notice, and the appropriate resolution is to
16 for this litigation to move forward.

17 Therefore, under the liberal pleading standards of Rule 8(a) and taking the allegations of
18 the FTC's complaint as true, this Court should deny Movants' motion to dismiss the complaint
19 against Blaugrund.

20 **V.    This Case Should Not Be Stayed**

21 The court's power to control its docket includes the "discretionary power to stay
22 proceedings." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005) (citing *Landis v.*
23 *North America Co.*, 299 U.S. 248, 254 (1936)). CardFlex's request for a stay should be denied
24 because: (1) CardFlex has requested a stay of indefinite length; (2) there is a fair possibility that
25 granting CardFlex's stay will harm consumers; and (3) the stay will not promote judicial
26 efficiency.

### A. CardFlex's Request for a Stay Should be Denied Because the Requested Stay is of Indefinite Length

When evaluating a request to stay a case, courts "balance the length of the stay against the strength of the justification given for it." *Young v. Immigration and Naturalization Service*, 208 F.3d 1116, 1119 (9th Cir. 2000) (citation omitted). Stays "[g]enerally, should not be indefinite in nature." *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059. 1067 (9th Cir. 2007). In *Dependable Highway Express*, the Ninth Circuit reversed a stay of domestic litigation pending an international arbitration because the district court "erred by issuing a stay without any indication that it would last only for a reasonable time." 498 F.3d at 1062, 1066. Similarly, the delay CardFlex requests would amount to an indefinite stay of unreasonable duration. The FTC's case against Jeremy Johnson does not yet have a trial date.[8] Even if there were a trial date, the length of the requested stay should be calculated based on when the parties' appeals have been fully exhausted, and not based on the starting date of the trial. In *Young*, the Ninth Circuit found that a district court's stay of an immigration decision pending the resolution of an already-filed appeal in a separate case was a stay whose "term is indefinite." 208 F.3d at 1119. The stay requested by CardFlex is even more indefinite because no trial date has been set in the FTC's case against Jeremy Johnson. This indefinite stay should be denied.

### B. The Balance of Harms Weights Against Granting a Stay

In balancing the hardships of a stay request in cases where a party seeks injunctive relief. "if there is even a fair possibility that the stay . . . will work damage to someone else, the party seeking the stay 'must make out a clear case of hardship or inequity.'" *Lockyer*, 398 F.3d at 1112 (quoting *Landis v. North American Co.,* 299 US 248, 255 (1936)). The FTC's suit against

---

[8] CardFlex claims the "iWorks/Johnson case" will proceed in March, but CardFlex appears to be confusing the criminal case against Jeremy Johnson with the FTC's suit against Jeremy Johnson. *See* Order Setting Trial Date, *United States v. Jeremy Johnson*, 2:11-cr-501 (D. Utah Aug. 14, 2014) (setting a March 2, 2014 trial date in the criminal action). The initial scheduling order in the FTC's civil suit against Johnson calls for the joint pretrial order to be filed "30 days after a decision of the dispositive motions." Joint Amended Scheduling Order, Docket Entry (675) at 2, *FTC v. Jeremy Johnson*, 2:10-cv-2203 (D. Nev. Aug. 8, 2012). Although the dates in that scheduling order have been modified by subsequent scheduling orders, the deadline for filing the pretrial order has not been altered. *See* Docket Entries (675, 857, and 1102).

14

CardFlex seeks a permanent injunction to prevent future violations of the FTC Act by CardFlex. Compl. at ¶ 89. CardFlex asserts that the FTC has failed to allege that CardFlex has "taken any efforts, since their alleged business dealings with iWorks, to facilitate the execution of unfair or deceptive trade practices." Mot. to Dismiss at 12. To the contrary, the FTC's complaint alleges that even after Wells Fargo terminated its business relationship with CardFlex, defendants Andrew Phillips and John Blaugrund still pursued negotiations with iWorks to continue processing payments through the Automated Clearing House network. *Id.* at ¶ 80. The complaint also alleges that CardFlex is currently processing merchant accounts through other acquiring banks. *Id.* at ¶ 81. Given the egregious nature of CardFlex's conduct in processing payments for iWorks, these allegations establish a "fair possibility" that a stay will damage other consumers. *See Lockyer,* 398 F.3d at 1112.

CardFlex has not met its burden of showing it will suffer a "clear case of hardship or inequity." *Id.* CardFlex claims that *consumers* will not be harmed by a stay, and asserts that the *FTC* will not be prejudiced by a stay, but CardFlex does not argue that *CardFlex* would suffer any injury if its request for a stay were denied. Mot. To Dismiss at 12. Nor could it. If the Court were to deny CardFlex's request for a stay, CardFlex would incur litigation costs, but the Ninth Circuit has already determined that "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*." *Lockyer*, 398 F.3d at 1112 (quoting *Landis v. North American Co.,* 299 U.S. 248, 255 (1936)).[9]

**C.**     **Judicial Economy Will Not Be Promoted by the Stay**

CardFlex's only remaining argument in support of a stay is the promotion of judicial economy. Judicial economy alone is not a sufficient reason to enter a stay. *See generally Dependable Highway*, 498 F.3d at 1066 (summarizing *Lockyer* as holding that "a *Landis* stay was inappropriate where grounds other than judicial efficiency were offered and found to lack merit").

---

[9] There is also no requirement that the FTC resolve its suit against iWorks first. For example, in *Neovi*, the FTC never brought a separate case against the "unscrupulous opportunists" who made the unauthorized debits. In *Windward Marketing*, the FTC sued the payment processor and its clients at the same time.

|    |    |
|---|---|
| 1  | Moreover, CardFlex has not made a sufficient showing that a stay would promote judicial |
| 2  | economy.  First, CardFlex implies, but does not explicitly concede, that it would be bound by the |
| 3  | results of *FTC v. Jeremy Johnson,* 2:10-cv-2203 (D. Nev. Dec. 21, 2010) ("iWorks case").[10] |
| 4  | Even if CardFlex were to agree to be bound, a resolution of the iWorks case may not create |
| 5  | findings of fact or law that are easily and directly applicable to the current case.  The FTC's |
| 6  | complaint in the iWorks case involves alleged misconduct beginning in 2006.  First Amended |
| 7  | Complaint (Docket Entry #830) at ¶ 4, *FTC v. Jeremy Johnson,* 2:10-cv-2203.  The conduct |
| 8  | alleged in this complaint begins in 2009.  Compl. at ¶ 20.  The FTC complaint against iWorks |
| 9  | alleges that iWorks used eight different payment processors and six different ISOs while iWorks |
| 10 | was in operation.  *Id.* at ¶ 272.  CardFlex is just one of those ISOs.  Given the scope of the |
| 11 | iWorks case, CardFlex's assertions of judicial economy are simply speculative. |

**VI.        Conclusion**

For all the foregoing reasons, CardFlex's Motion to Dismiss should be denied.

Dated: October 9, 2014

Respectfully submitted,

/s/ Benjamin R. Davidson
Benjamin R. Davidson
Karen S. Hobbs

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

---

[10] CardFlex argues that the "possibility of inconsistent verdicts is eliminated" if this case were stayed until the outcome of the FTC's suit against Jeremy Johnson.  Mot. to Dismiss at 12.

16

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2014, I electronically filed the with the Clerk of the Court using CM/ECF, and caused a copy of the same to be served on all parties in the manner specified below:

**Via CM/ECF**

Christopher H. Byrd
Matthew Peter Digesti
Fennemore Craig Jones Vargas
300 South Fourth Street
Suite 1400
Las Vegas, NV 89101
*Counsel for CardFlex, Inc.,*
*Andrew M. Phillips and John S. Blaugrund*

Robert Jeremy Adamson
Kunzler Law Group
8 East Broadway, Ste 600
Salt Lake City, UT 84111

Richard T Creer
Kamer Zucker Abbott
300 West Charleston Boulevard
Las Vegas, NV 89102

*Counsel for Blaze Processing LLC, Mach 1 Merchanting, LLC and Shane Fisher*

Matthew E. Jensen
Parr Brown Gee & Loveless
101 South 200 East, Suite 700
Salt Lake City, UT 84111

Ronald J. Thompson
Holley, Driggs, Walch, Puzey & Thompson
400 South Fourth Street, Third Floor
Las Vegas, NV 89101

*Counsel for Jeremy Livingston*

　　　　　　　　　　　　/s/ Benjamin R. Davidson
　　　　　　　　　　　　Benjamin R. Davidson