UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:14-cv-00397-MMD-CLB |
| Plaintiff, | ORDER |
| v. | |
| CARDFLEX, INC., *et al.*, | |
| Defendants. | |

**I.     SUMMARY**

This action arises from a 2014 lawsuit in which Plaintiff Federal Trade Commission ("FTC") alleged that Defendant payment processor Cardflex, Inc. (N/K/A Cliq Inc.) ("Cliq") and Defendants Andrew Phillips and John Blaugrund (collectively, "Defendants") worked with a group of merchants known as iWorks to process unauthorized payments, thereby causing $26 million in consumer harm. (ECF No. 1.) On May 5, 2015, the Court entered a stipulated permanent injunction and final order against Defendants, under which Defendants were required to take certain steps to run their payment processing business. (ECF No. 54 ("Final Order").) Before the Court is the FTC's combined motion to (1) hold Defendants in contempt of the Final Order; and (2) modify the Final Order against Defendants. (ECF No. 64 (sealed) / 102 (unsealed) ("Combined Motion")).[1] Defendants then separately filed their own motion to modify the Final Order. (ECF No. 159 ("Motion to Modify")[2].)

---

[1]Defendants responded (ECF No. 132 (sealed)) and the FTC replied (ECF No. 191).

[2]The FTC responded (ECF No. 197 (unsealed) / 198 (sealed)) and Defendants replied (ECF No. 213).

On April 21, 2026, the Court held oral argument (ECF No. 223 ("Hearing"))[3] on the Combined Motion and the Motion to Modify. Because Defendants have violated four provisions of the Final Order, the Court grants the Combined Motion in part, imposing civil contempt sanctions, though not in the amount the FTC requested, and denying coercive relief and modification of the Final Order. The Court further denies the Motion to Modify.

## II.    BACKGROUND

The Final Order contains four primary conduct provisions applicable to Defendants, described briefly, in pertinent part, as follows:

Section I permanently restrains and enjoins Defendants from payment processing for any client listed on the MasterCard Member Alert to Control High-risk (Merchants) ("MATCH") list for various reasons including excessive chargebacks or fraud and illegal transactions. (ECF No. 54 at 9.) Section II prohibits Defendants from assisting or facilitating any client's tactics to avoid bank and credit card network fraud and risk monitoring programs, including, but not limited to, balancing or distributing sales transaction volume or sales transaction activity among multiple merchant accounts or using shell companies to apply for additional merchant accounts. (*Id.* at 9-10.) Section III prohibits Defendants from processing transactions for High Risk Clients without first engaging in reasonable screening to determine whether the prospective High Risk Client's business practices are or are likely to be deceptive. (*Id.* at 10-13.) It provides a list of reasonable screening requirements, including but not limited to, collecting certain information from clients and taking reasonable steps to assess the accuracy of that information. Section IV prohibits Defendants from, among other things, failing to monitor High Risk Clients' sales and transactions to determine whether they are engaged in practices that are deceptive. It requires Defendants to monitor Chargeback Rates and Total Return Rates for certain clients and take actions when particular thresholds are

---

[3]During the Hearing, the Court granted Defendants' motion to strike or file a sur-reply (ECF No. 200 (sealed) / 201 (unsealed)), in part. (ECF No. 223 (holding that the Court will consider only pages 7-10 and 11-14 of the proposed sur-reply).)

triggered, including conducting a reasonable investigation, and ceasing processing and closing those client accounts unless Defendants drafted a written report justifying continued processing. (*Id.* at 14-17.)

The FTC claims that Defendants have systematically violated Sections I, II, III and VI by:

> (1) processing payments for explicitly prohibited merchants; (2) failing to adequately underwrite their merchant customers; (3) failing to monitor and then stop processing for merchants that reach certain transaction thresholds; and (4) assisting or otherwise continuing to process for merchants taking steps to evade fraud monitoring programs.

(ECF No. 102 at 8.) The FTC argues that Defendants' processing for two merchants—Target Fulfillment, LLC ("Target Fulfillment") and Emblaze One Inc. (d/b/a Limitless X)/the Wellington Group ("Limitless") are emblematic of Defendants' violations. (*Id.* at 15.) The FTC also claims that Defendants' payment processing for other merchants,[4] including some of their most profitable, violated the Final Order. (*Id.* at 16.) The Court will address the FTC's Combined Motion as to the following merchants, in turn: Target Fulfillment, Limitless, Premier Health and iBuumerang, LLC ("iBuumerang").

## III.    COMBINED MOTION: CIVIL CONTEMPT

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). For issuance of a contempt order to be proper, the FTC must establish (1) that Defendants violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence. *See Lab./Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (citation modified); *see also Oracle USA, Inc. v. Rimini St., Inc.*, 81 F.4th 843, 851-52 (9th Cir. 2023) (contempt sanctions forbidden where the contested action

---

[4]The FTC insists that Defendants have processed for other problematic merchants. (ECF No. 102 at 49.) The Court need not address these other merchants because, as discussed herein, it finds that the FTC has satisfied its burden as to the merchants discussed in this Order.

3

was based on a "good faith and reasonable interpretation" of the court's order, in "substantial compliance" with the order, or where there was only a "technical violation" of the order) (citation modified).

Once the moving party has met its burden, the "burden then shifts to the contemnors to demonstrate why they were unable to comply." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999). Substantial compliance is a defense to an action for civil contempt for an alleged contemnor "who, despite not achieving total compliance, has achieved near-total compliance through the exhaustion of all reasonable efforts." *Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025); *see also Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (contemnor "may avoid a finding of civil contempt only by showing it took *all* reasonable steps to comply with the order.")

### A.    Violations – Target Fulfillment

The FTC alleges that Defendants' processing for Target Fulfillment violated Sections II, III and IV of the Final Order. (ECF No. 102 at 32-42.) Target Fulfillment and its related firm, Energia, sold dietary supplements through deceptive sales and processed through merchant accounts in the name of shell companies. (ECF No. 107 at 99-101; 103-04.) Defendants processed approximately $53 million for Target Fulfillment, net of chargebacks and refunds, from December 2020 until December 2022, when Target Fulfillment was indicted for criminal conspiracy[5]. (ECF No. 107 at 22-23.) The Court finds that the FTC has met its burden as to Defendants' violations of the Final Order with regard to Target Fulfillment.

Section III required Defendants to obtain and evaluate information obtained from Target Fulfillment, including its principals, business, banking history, and prior payment processing and chargeback history. (ECF No. 54 at 10-13.) In September 2020, sales agent Ken Haller contacted Cliq through Philips to obtain merchant processing for "Target Fulfillment + Energia," describing the merchant accounts as "just LLCS for each product

---

[5]*See United States v. Bawden, et al.*, Case No. 22-cr-481 (D. Utah).

– the parent corp is Target Fulfillment." (ECF Nos. 107-3 at 89-91; 107-2 at 72; 112-2 at 218). The FTC provides a declaration from Target Fulfillment and Energia's senior employee Lyman Chrisler[6], who worked with other principals Scott Nemrow and Phillip Gannuscia, explaining that the applications Target Fulfillment submitted for payment processing were for facially unrelated companies and included "companies and purported owners of those companies who were not employees or officers of Energia who, in fact, had no role in marketing, selling, fulfilling, or otherwise servicing the sales associated with these accounts." (ECF No. 107 at 99, 103.) The articles of incorporation for these entities show they had been created just weeks earlier. (ECF No. 107-3 at 47, 50, 81, 84.) Defendants knew that Target Fulfillment owned or controlled these entities, but Defendants did not receive or ask for Target Fulfillment's prior processing history, nor did they collect the consumer fraud history of Gannauscia and Nemrow as they were required to do under the Final Order. (ECF Nos. 108 at 7 (January 2021 email from Haller to Blaugrund noting he was "add[ing] Scott [Nemrow] who manages Target Fulfillment operations."); 54 at 12.) Moreover, while Defendants were required to take reasonable steps to assess the accuracy of the information they obtained during screening, the FTC presents evidence that Target Fulfillment provided obviously false storefronts for its websites that Defendants failed to further investigate. (ECF Nos. 107 at 100; 107-4 at 4-10; 12-20; 22-26; 73-1 (sealed) at 195.)

Section IV.F requires Defendants to immediately stop processing sales transactions and close processing accounts for any High Risk Client that Defendants know or should know are engaged in tactics to avoid fraud detection, and Section II prohibits Defendants from assisting or facilitating a Client's tactics to avoid fraud and risk monitoring programs. First, the FTC offers ample evidence—and Defendants do not deny—that Defendants were aware that Target Fulfillment was running prepaid credit

---

[6]The Court notes Defendants' assertion that the Court should be skeptical of Chrisler's declaration because Chrisler pled guilty and was motivated to lessen his sentence. (ECF No. 132 at 23.) But the Court is unpersuaded that Chrisler's credibility should be impugned solely for those reasons.

cards as "friendlies" to avoid fraud monitoring programs by artificially lowering their chargeback rates. Indeed, Phillips confronted Target Fulfillment about this issue during an in-person meeting in March 2021, and Target Fulfillment admitted to running friendlies. (ECF Nos. 107 at 105; 132 at 27.) Despite this, Defendants continued to process over $36 million for Target Fulfillment between April 2021 and December 2022. (ECF No. 107 at 22-23.)

Section IV.E required Defendants to complete a reasonable investigation of the high chargeback rate culminating in a written report with facts demonstrating that the client's business practices are not deceptive or cease processing sales transactions and close accounts. (ECF No. 54 at 16.) The FTC presents evidence that Target Fulfillment triggered the Final Order's monitoring requirements due to high chargebacks almost immediately, and Blaugrund was aware of high monthly chargeback rates of the Target Fulfillment accounts. (ECF Nos. 107 at 22; 108 at 126-27, 9.) Indeed, Target Fulfillment's chargeback rates were in excess of the 1% triggering requirement for the investigation requirements every month from February 2021 through December 2022. (ECF No. 107 at 22-23.) Despite this, Defendants failed to complete written reports as to Target Fulfillment accounts.[7]

Because the FTC has met its burden of showing by clear and convincing evidence that Defendants violated Section II, III and IV of the Final Order, the burden now shifts to Defendants. Defendants argue that their efforts at underwriting and screening Target Fulfillment demonstrate good faith efforts at substantial compliance. (ECF No. 132 at 23-26.) Defendants point to information they did collect, including information received from

---

[7]The FTC's Combined Motion addresses Defendants' failure to comply with written reports in the aggregate. (ECF No. 102 at 27-29.) The FTC has presented clear and convincing evidence that Defendants systematically failed to complete its reporting obligations, failing to investigate 77 of the 168 merchants they identified as triggering the Section IV's thresholds, and continuing to process for 25 of those 77 merchants. (ECF No. 107 at 33.) Moreover, the FTC provides evidence that none of Defendants' 198 purported "Investigation Reports" are sufficient to justify continued processing by clear and convincing evidence. (ECF No. 107-1 at 92-98 (declaration of FTC investigator summarizing review and analysis of reports).)

Target Fulfillment as to the new LLCs (ECF No. 138 at 120-32), a LexisNexis AML report indicating Target Fulfillment had an "elevated" business risk (ECF No. 133 at 26), and images taken from the website of Solid Enhancement, one of Target Fulfillment's shell companies. (ECF No. 133 at 113-29). But as the FTC correctly points out, these efforts did not comply with the Final Order. Next, Defendants insist that they did not facilitate the processing of friendlies because they confronted Target Fulfillment and monitored the situation until the transactions were reduced to "a negligible amount." (ECF No. 132 at 27-28.) Even if this was true[8], Defendants were required to immediately stop processing sales and close the accounts under Section IV.F.

As to investigation and reporting requirements[9], Defendants argue that they substantially complied with Section IV because only a small portion of its merchants triggered the Final Order's thresholds, most of the Merchant Identification Numbers ("MIDS") that triggered the Section IV thresholds did so during COVID-19, and that while Defendants' "investigations may neither have met all the formulaic investigation requirements set forth in the [Final] Order nor have been reduced to writing in the exact format required, [Defendants] conducted and completed rigorous investigations. . . ." (ECF No. 132 at 29-31.)

These arguments are unpersuasive. First, Defendants' argument that they substantially complied with the Section IV as to most MIDs is neither here nor there, because substantial compliance is only available to alleged contemnors who have taken "*all* reasonable steps to comply," and Defendants have failed to show that they have done so. *Kelly*, 822 F.3d at 1096 (emphasis in original). Second, Defendants invoke the

---

[8]Defendants' evidence—April 2021 email correspondence tracking the chargeback ratios and noting they were "getting pretty high" (ECF No. 108 at 126-131) and a May 2021 email noting that Target Fulfillment accounts have "lowered their chargeback ratio, but they have each processed about 3,000 prepaid cards" (ECF No. 108 at 151-152)—does not support their claim that the volume of transactions was negligible.

[9]Defendants' response brief—like the FTC's Combined Motion—addresses Section IV's investigation and reporting requirements in the aggregate.

COVID-19 pandemic—citing to a publication that states that a "side effect of the increase in unemployment" is that some consumers "fil[e] chargebacks"—with no explanation as to how it was therefore unreasonable for Defendants to comply with Section IV. (ECF No. 132 at 30 (citing ECF No. 139 at 89).) Lastly, Defendants essentially cede that they did not complete the investigation and reporting obligations of Section IV while brushing these requirements off as "formulaic." But this is not for Defendants to decide; indeed, Defendants stipulated to the Final Order.

In sum, Defendants' arguments as to compliance and substantial compliance miss the mark. Defendants did not comply with the screening and underwriting requirements of Section III. Defendants knew Target Fulfillment was running friendlies and did not immediately cease processing and close Target Fulfillment accounts in violation of Sections IV and II. And though Defendants essentially assert that they substantially complied with Sections III and IV because they obtained *some* information during screening and completed *some* reports, as previously explained, substantial compliance is only available to alleged contemnors who have exhausted all reasonable efforts. *See Coleman*, 131 F.4th at 956. Defendants have failed to make such a showing. Accordingly, the Court finds that Defendants' processing for Target Fulfilment violated Sections II, III and IV of the Final Order.

### B.   Violations – Limitless

The FTC alleges that Defendants violated Sections I, II, III and IV by processing over $100 million for Limitless, $70 million of which came from transactions processed after Limitless was MATCH listed. (ECF No. 102 at 19-20, 27-29, 42-49.) Haller introduced Defendants to dietary supplement operation, Limitless and its CEO, Jas Mathur in August 2020. (ECF No. 107-2 at 77-80.) Defendants began processing for Limitless in September 2020, until Defendants' bank, Evolve, ultimately gave Defendants until May 28, 2021 to terminate Limitless accounts. (ECF Nos. 107 at 25; 108-1 at 4-5.)[10]

---

[10]Evolve initiated this demand for "immediate termination" of Limitless and its related accounts in January 2021, citing the "merchants fraud increase as well as the Visa

Defendants, however, continued to process for Limitless by processing for shell companies controlled by Mathur that were internally dubbed "the Wellington Group." (ECF No. 102 at 45-46.) As explained below, the Court finds that the FTC has demonstrated by clear and convincing evidence that Defendants violated the four sections of the Final Order.

The FTC provides clear and convincing evidence sufficient to show that Defendants' underwriting and screening was in violation of Section III. (ECF No. 102 at 43-44.) Haller pitched Limitless to Defendants, explaining that Emblaze One Inc. was the umbrella for other Limitless merchant accounts. (ECF Nos. 107-2 at 79, 90.) Defendants began processing the merchant applications on a "rush" basis, but to process applications quickly, Defendants failed to collect information either by collecting applications that did not require such information or by expressly waiving such requirements. (ECF Nos. 107-3 at 12, 40-43, 93-96, 98-101; 107-1 at 47; 107-4 at 62-66.)

The FTC shows clear and convincing evidence that Defendants violated Section IV by failing to properly monitor Limitless. Approximately two months after Mathur submitted revised applications to Defendants for processing, Evolve notified Defendants that the Limitless merchant account was placed in the Visa Dispute Monitoring Program ("VDMP"). (ECF No. 107-3 at 154.) Evolve contacted Defendants on at least two other occasions due to notices from VDMP. (ECF Nos. 107-4 at 71; 108 at 12.) After Defendants closed the Limitless accounts in May 2021, Defendants submitted applications for Wellington Group merchant processing accounts to Evolve in July 2021. (ECF No. 108-2 at 40-47.) The FTC provides ample evidence that Defendants knew the Wellington Group was actually Limitless and Mathur: Defendants' Wellington Group contacts were Mathur and other Limitless employees (ECF Nos. 108-3 at 7, 33, 49-53; 111 at 5; 108-4 at 33.)

---

notices of transaction laundering/gambling transactions." (ECF No. 107-4 at 142-43, 145.) Defendants "implore[d]" Evolve to reconsider, noting that Limitless and another client flagged "represents closing 20% of our business." (*Id.* at 142.)

The Wellington Group's accounts consistently exceeded the Final Order's monitoring and investigation thresholds starting in August 2021, with chargeback rates rising as high as 18.4% in December 2021. (ECF No. 107 at 24-25.) Yet Defendants' reports—rarely completed, as discussed *supra*—did not justify continued processing under the Final Order. (ECF Nos. 107-1 at 91-98; 111 at 68 (report for a Wellington Group merchant noting that the lack of size options "is a clear red flag for the site, how is the customer supposed to know what they will receive."); 111 at 122 (report for a Wellington Group merchant stating the "site has the same characteristics as other merchant accounts that we have closed for fraud or other risk related concerns").)

When accounts were closed, Defendants allowed Mathur to shift processing to other accounts or open new accounts, sometimes delaying closing accounts until replacement accounts were opened. (ECF Nos. 109-1 at 3 (August 2022 email from Mathur asking Phillips why accounts were closed and Phillips responding to "load up on the MID's we have up and running"); 110-2 at 37 (January 2023 email from Mathur noting Phillips' assurance that the "closure [would be] extended a little as we're waiting on getting some new accounts set up"); 109-3 at 56 (September 2022 email from Phillips to Mathur stating, "Got to shut [this account] down also. Let's open the cosmetics for this one.").)

The FTC provides clear and convincing evidence that Defendants violated Section II by obtaining processing for Limitless and Mathur, concealing their MATCH listing. The FTC offers a January 2023 email between Blaugrund, Phillips, and an employee, discussing whether to omit Mathur from banking application materials. (ECF No. 110-2 at 74-45 (employee stating that "our intention was to eliminate Jas [from] the submission since he is on Match.").) Phillips instructed the employee to use the existing letter with Mathur on it. (*Id.*) However, the bank verification failed due to Mathur's inclusion as a signatory on the account, leading Phillips to ultimately omit Mathur from the application materials and successfully open an account. (ECF Nos. 110-3 at 4 (Phillips stating, "OK, I'll either get another bank account that just has Danielle on it or have [Mathur] remove himself from this [account]"); 111 at 9-10.)

10

Lastly, the FTC presents clear and convincing evidence that Defendants violated Section I of the Final Order by processing payments for Limitless after it was added to the MATCH list. Defendants were notified on May 6, 2021 that Limitless was placed on the MATCH list in April 2021 for illegal transactions. (ECF No. 108 at 133.) However, as discussed above, Defendants continued processing for Limitless, under the guise of the Wellington Group. Defendants processed an additional $71,694,998 for Limitless between May 2021 and April 2024. (ECF No. 107 at 26.)

Having found that the FTC has met its burden, the burden then shifts to Defendants. In gist, Defendants argue that their processing for Limitless did not violate the Final Order because (1) their underwriting and screening substantially complied with the Final Order, (2) they did not assist or facilitate fraud because they did not omit Mathur from merchant application materials, (3) they were permitted to process for Limitless because its MATCH listing was erroneous, and (4) and they substantially complied with investigation and reporting requirements. (ECF No. 132 at 14-16, 20-23, 28, 29-31.)

As to screening and underwriting, Defendants requested information including a completed and signed application and other supporting documentation, and Defendants were provided with documentation related to Emblaze. (ECF Nos. 132 at 21-23; 138 at 177; 139 at 107-142.) But Defendants do not, as the FTC points out in its reply brief, provide evidence showing that they gathered information required by the Final Order, including the business and trade names, fictitious names, DBAs, and websites used by Emblaze and Limitless. Defendants, in their response brief, argue that they "dove quite deep into these subjects," citing to a declaration from Richard Donohue, Senior Vice President of Cliq, listing the "information and documents" Defendants evaluate during the screening process. (ECF No. 132 at 22 (citing ECF No. 132-5 at 6-7.).) But this evidence is not enough to show that Defendants collected the information as to Limitless, nor have Defendants rebutted the FTC's evidence that Defendants waived requirements.

Defendants insist that they did not violate Section II because Phillips instructed the employee to use the bank letter with Mathur on it. (ECF No. 132 at 29.) At the Hearing,

Defendants again challenged the FTC's evidence. (ECF No. 224 at 40 (arguing that ECF No. 110-3 at 4 does not show clear and convincing evidence of fraud, merely that "Phillips expressed an intent to either get another bank account which didn't have Mr. Mathur or to have Mr. Mathur remove himself.").) Setting aside whether this argument is even convincing, the Court finds that the FTC has presented ample evidence in the record that Defendants assisted and facilitated Limitless in avoiding fraud and risk monitoring programs—namely, by processing for Limitless as the Wellington Group, and by enabling Mathur to shift processing transactions to other accounts.

Lastly, Defendants argue they complied with Section I because they purportedly conducted their own investigation and determined that Limitless's MATCH listing was erroneous. Defendants discovered that a payment company that Limitless was working with, Greenbox POS, had run gambling transactions through the wrong account, because of a "technical misconfiguration." (ECF Nos. 132 at 14; 139 at 38-39.) Defendants thus argue that processing was consistent with a reasonable interpretation of the Final Order, because Limitless was not added to the MATCH list by "reason" of "illegal transactions." (ECF No. 132 at 14-15.) The Court finds this argument unpersuasive, because under the clear language of the Final Order, Defendants are prohibited from processing for any client listed on MATCH for illegal transactions, and the Final Order does not entitle or empower Defendants to conduct their own independent investigation and find a MATCH listing erroneous. Thus, the Court rejects Defendants' interpretation of Section I of the Final Order's unambiguous requirements, which does not permit Defendants to investigate whether the listing of the Client was pretextual as Defendants argued at the Hearing.

Here, the Court finds that Defendants have failed to demonstrate that they complied or substantially complied with the Final Order. The Court thus finds that the FTC

has provided clear and convincing evidence that Defendants' processing for Limitless violated Sections I, II, III, and IV[11] of the Final Order.

### C.   Violations – Premier Health and iBuumerang

The FTC contends that Defendants have processed millions of transactions and hundreds of millions of dollars from at least three clients on the MATCH list—Premier Health, Limitless,[12] and iBuumerang. (ECF No. 102 at 16-21.) Defendants argue that the FTC fails to meet its burden because the FTC has only identified three merchants—a small fraction of their total portfolio—thus underscoring Defendants' substantial compliance. (ECF No. 132 at 13.) Defendants further argue they had documented "reasonable, case-specific qualitative grounds" for its processing for the challenged merchants. (*Id.*)

The Court finds that the FTC has provided clear and convincing evidence that Defendants violated Section I by processing payments for iBuumerang and Premier Health while both MATCH listed. Defendants began payment processing for Premier Health in 2019 (ECF No. 112-2 at 213-14), despite being aware that Premier Health had been placed on the MATCH list in April 2020 for excessive chargebacks. (ECF No. 107-2 at 4-5.) In violation of the Final Order, Defendants continued to process an additional $592,707,404 in accounts between May 2020 and April 2024. (ECF Nos. 107 at 27-29.) Moreover, Defendants began processing for iBuumerang in September 2020, though it was placed on the MATCH list just one month earlier for excessive chargebacks. (ECF Nos. 65-1 at 73-74; 108-1 at 35.)

The Court finds that Defendants have demonstrated neither substantial compliance nor good faith and reasonable interpretation of the Final Order. First,

---

[11]The Court adopts its analysis as to Defendants' failure to substantially comply with Section IV's investigation and reporting requirements, *supra*. Moreover, the Court finds the FTC's evidence of Defendants' violation particularly compelling, given that the FTC has provided specific examples of Defendants' deficient written reports related to Limitless.

[12]The Court previously addressed Defendants' payment processing for Limitless while it was on the MATCH list, *supra*.

Defendants attempt to minimize their noncompliance by suggesting that the three MATCH listed merchants represent only 57 MIDs out of the over 97,000 MIDs in Defendants' portfolio. (ECF No. 132 at 13.) The FTC counters in its reply brief that these merchants are among Defendants' most profitable, constituting over 40% of their processing profits. (ECF Nos. 181 at 7.) Defendants rebutted this point during the Hearing, representing to the Court that the FTC's analysis was incorrect and the MIDs constitute only about 5% of the profits of their top 40 merchants.[13] (ECF No. 224 at 60-62 (explaining ECF No. 110-2 at 79-82).) Either way, Defendants' argument is infirmed. Substantial compliance is not measured by how many or how profitable these merchants were, but rather, whether Defendants "achieved near-total compliance through the exhaustion of all reasonable efforts." *Coleman*, 131 F.4th at 956. Defendants, by their own admission, did not exhaust all reasonable efforts.

As the Court previously explained in relation to Limitless, *supra*, the Final Order did not permit Defendants to conduct an independent investigation as to a MATCH listing and decide that the MATCH listing was erroneous. And it was not a reasonable or good faith interpretation to find otherwise. Accordingly, it was not appropriate for Defendants to decide that they could process payments for iBuumerang because Defendants decided that it was "not actually listed "for the reason of' excessive chargebacks." (ECF No. 132 at 16-17.) Nor was it proper for Defendants to process for Premier Health because they "determined that Premier Health's heightened chargebacks were a consequence of the COVID-19 pandemic." (*Id.* at 18.) Under the plain terms of the Final Order, Defendants were not permitted to process payments for these merchants.

Accordingly, the Court finds that the FTC has demonstrated by clear and convincing evidence that Defendants violated Section I by processing payments for iBuumerang and Premier Health.

---

[13]Notably, Defendants' counsel did not know the category or metric by which a merchant was listed in the top 40, when asked by the Court.

### D. Summary

As explained herein, the Court finds that Defendants are in contempt of the Final Order. The Court will next address the parties' arguments as to sanctions.

## IV. COMBINED MOTION: CONTEMPT SANCTIONS

"[T]he purpose of civil sanctions is to 'coerce' compliance with a court order or to 'compensate' the aggrieved party for sustained losses." *Oracle USA,* 81 F.4th at 858 (citing *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016)); *see also United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947) (explaining that civil contempt sanctions may be employed for one or both of two purposes: "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."). "District courts have broad equitable power to order appropriate relief in civil contempt proceedings." *FTC v. EDebitPay, LLC*, 695 F.3d 938, 945 (9th Cir. 2012) (quotation marks omitted) (quoting *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003). For compensatory relief, district courts have "have broad discretion to use consumer loss to calculate sanctions for civil contempt of an FTC consent order' so long as they can 'explain why the use of consumer loss is appropriate and why the remedy is commensurate with the harm.'" *FTC v. Success By Media Holdings Inc.*, 159 F.4th 1159, 1167 (9th Cir. 2025) (quoting *EDebitPay*, 695 F.3d at 945). As to coercive relief, the court has power to "grant the relief that is necessary to effect compliance. . . ." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949).

### A. Compensatory Relief

The FTC seeks compensatory relief in an amount of at least $52,927,030, which is the amount that Defendants processed for Target Fulfillment, net of refunds and chargebacks, in violation of the Final Order. (ECF No. 102 at 53.) Defendants argue that this amount is grossly punitive, and the amount the FTC seeks is not permitted because under *Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71 (2020), equitable remedies must be based upon a defendant's profit, and since Defendants only receive a fee based on a tiny percentage of the transaction amount, the proper amount is a much smaller sum. (ECF

No. 132 at 46-47.) Defendants also rely heavily on a Second Circuit case, *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006), arguing in essence that the FTC's reliance on seller cases is inapposite because Defendants merely process the payment. (*Id.* at 44-45.)

Turning first to Defendants' argument, the Court agrees with the FTC that *Liu* and *Verity* do not apply here. In *Liu*, the United States Supreme Court held that a disgorgement award in a SEC civil enforcement action under the Securities Exchange Act cannot exceed the wrongdoer's net profits. 591 U.S. 71, 75 (2020). Defendants argue that the Supreme Court's "examin[ation of] what relief is 'typically available in equity'" presents a "limitation [that] holds sway here." (ECF No. 132 at 46 (quoting *Liu*, 591 U.S. at 79).) But the Court agrees with the FTC that it "is not seeking statutory or equitable relief under the. . . Securities and Exchange Act." (ECF No. 191 at 30.)[14] The Court also finds persuasive that other district courts in this circuit have reached the same conclusion. *See, e.g., FTC v. Mytel Int'l, Inc.*, No. 2:87-CV-07259-SPG-SS, 2022 WL 3350391, at *5 n.4 (C.D. Cal. Aug. 11, 2022) (collecting cases); *FTC* v. *Noland*, No. CV-20-00047-PHX-DWL, 2020 WL 4530459, at *4 (D. Ariz. Aug. 6, 2020) ("Additionally, *Liu* addressed the disgorgement remedy the SEC may seek under its governing statute and didn't once discuss the FTC, which is governed by an entirely different statute. . . . [I]t would be improper to read *Liu* as necessarily curtailing the scope of the FTC's authority."). In *Verity*, the Second Circuit held that the district court had erred by measuring the amount of restitution in a section 13(b) FTC Act case as the amount of consumer loss, rather than the amount of defendant's gain. 443 F.3d at 67. The court noted that where direct transactions for good and services are concerned, "the defendant's gain will be equal to the consumer's loss" but under the payment structure, defendants were only unjustly enriched by a fraction of the measure of consumer loss. *See id.* at 68. But as the FTC correctly points out, it seeks compensatory relief measured by actual loss, and

---

[14]The Court also agrees with the FTC that Defendants' reliance on *FTC v. Verity Int'l Ltd.* 443 F.3d 48 (2d Cir. 2006) is unpersuasive, because *Verity* concerned equitable disgorgement brought under the FTC Act section 13(b), not contempt sanctions.

Defendants invoke "the wrong law regarding the wrong remedies." (ECF No. 191 at 39.) Accordingly, the Court does not find Defendants' argument as to *Liu* or *Verity* persuasive.

The Court now turns to the sum of $52,927,030 requested by the FTC.[15] The FTC asserts in its reply brief "[t]he Ninth Circuit bases compensatory awards based on consumer loss, not the amount of profits or revenues. *See, e.g., . . . FTC v. EDebitPay, LLC*, 695 F.3d 938, 945 (9th Cir. 2012) ('[D]istrict courts . . . use consumer loss.')." (ECF No. 191 at 38.) But the portion of the quotation that is omitted underscores the Court's discretion: "district courts have broad discretion to use consumer loss to calculate sanctions for civil contempt." *EDebitPay*, 695 F.3d at 945. Indeed, this court has "broad equitable power to order appropriate relief in civil contempt proceedings." *Hickey*, 322 F.3d at 1128. That said, Defendants' response, which mainly opposes sanctions, does not provide information helpful to the Court's exercise of its equitable power. Defendants' response asserts that "Cliq receives a fee calculated as a tiny percentage of the transaction amount," citing to its Chief Financial Officer's (Joanna Oliva) declaration. (ECF No. 132 at 44; ECF No. 132-4.) Oliva's declaration states "Cliq received only $1.58 million in gross revenues" from Target Fulfillment and its profits from these transactions "were less than $700,000." (ECF No. 132-4 at 5[16].) Oliva further states that Cliq's net revenue from payment processing was between $13 million and $24 million in recent years. (*Id.* at 3.)

The Court finds that sanctions in an amount between the FTC's claimed consumer loss of nearly $53 million and Defendants' gain from its payment processing service is an appropriate compensatory remedy. The FTC states, and the Court agrees, that it has "shown Target Fulfillment has deceived and stole money from consumers" and Defendants "were key to causing this injury: without processing accounts, Target

---

[15]The Court notes the FTC's argument, as represented in the Hearing, that a remedy that is based on Defendants' profits would be impermissibly punitive, even if a lesser amount. (ECF No. 224 at 9-10.) But the FTC provides no supporting legal authority for this claim.

[16]The declaration does not attach any exhibits with profit data.

Fulfillment would not have been able to victimize these consumers." (ECF No. 191 at 38-39.) In support of its request, the FTC relies upon *Success by Media Holdings* and *EDebitPay*—cases involving marketer or seller to consumer schemes where the Ninth Circuit affirmed awards to the FTC in the full amount of consumer loss. But given that this case concerns a payment processor, the Court finds that consumer loss is not the appropriate measure of sanctions. Accepting Defendants' representation that Cliq received $1.58 million in gross revenues from the Target Fulfillment related transactions alone[17] and Cliq's net revenue from its entire payment process business for its lowest recent revenue earning year and considering Defendants' violations as related to the other transactions discussed herein, the Court finds that contempt sanctions in the amount of $6.5 million would appropriately track the compensatory nature of sanctions and are "commensurate with the harm" under the circumstances here. *See Success by Media Holdings*, 159 F.4th at 1167.

### B.    Coercive Relief

The FTC requests the appointment of a receiver to bring Cliq into compliance with the Final Order. (ECF No. 102 at 54-55.) The FTC contends that a receiver is necessary because Phillips and Blaugrund "cannot be trusted to operate the company lawfully, the only way to ensure compliance is to empower a neutral third party to take control of Cliq, evaluate the business, and impose the necessary policies." (*Id.* at 55.) Defendants contend that appointment of a receiver is reserved for extreme situations not warranted here given Cliq's clear commitment to compliance, and that the appointment of a receiver would be practically unworkable. (ECF No. 132 at 41-42.) The FTC counters in its reply brief that Cliq remains in noncompliance therefore a receiver is appropriate. (ECF No. 191 at 40.)

The Court denies the FTC's request for appointment of a receiver. While the Court rejects Defendants' argument that the record shows past compliance, the Court finds that

---

[17]The FTC does not contest this sum in its reply brief.

the extreme remedy of a receivership is not reasonable under the circumstances. The FTC has failed to persuade, let alone explain in its briefing or representations during the Hearing, why other solutions, such as a monitor or allowing Cliq to find a proper replacement, could not result in compliance with the Final Order. And given the current record, the Court cannot find that the civil contempt sanctions imposed may not sufficiently compel future compliance. Accordingly, the Court will deny the FTC's request as to coercive sanctions in the form of a receivership, finding that the requested remedy is not necessary to effect compliance. *See McComb*, 336 U.S. at 193.

## V.    COMBINED MOTION: ORDER MODIFICATION

Additionally, the FTC seeks to modify the Final Order under Federal Rule of Civil Procedure 60(b) by permanently banning Phillips and Blaugrund from the payment processing industry and appointing a receiver to take control of Cliq. (ECF Nos. 102 at 55-59.)

Federal Rule of Civil Procedure 60(b) codifies the Court's "inherent power to modify court orders in changed circumstances." *Kelly*, 822 F.3d at 1098 (quoting *United States v. Swift & Co.*, 286 U.S. 106, 114-15 (1932). In *United States v. Asarco, Inc.*, the Ninth Circuit Court of Appeals reiterated the "two-prong standard" for modification of a consent decree under Rule 60(b)(5). 430 F.3d 972, 979 (9th Cir. 2005) (citing *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) in which the Supreme Court articulated the two-prong standard.). First, the party seeking modification "must satisfy the initial burden of showing a significant change either in factual conditions or in the law warranting modification of the decree." *Asarco*, 430 F.3d at 979. Second, the Court must "determine whether the proposed modification is suitably tailored to resolve the problems created by the changed factual or legal conditions." *Id.*

Here, the Court agrees with the FTC that Phillips and Blaugrund have repeatedly disregarded the Court's Final Order, which constitutes a change in factual conditions that satisfies the first prong. (ECF No. 102 at 56 (collecting cases).) However, the Court does not agree that the proposed modification—imposition of a lifetime industry ban on Phillips

or Blaugrund—is suitably tailored under these circumstances, especially given that the compensatory sanctions granted in this order may result in future compliance. Accordingly, the Court denies the FTC's Combined Motion to the extent it seeks to modify the Final Order.[18]

## VI.   MOTION TO MODIFY

Defendants seek a modification of the Final Order under Federal Rule of Civil Procedure 60(b)(5)[19], contending significant changes in e-commerce and the financial industry have rendered the Final Order "ineffective and far more onerous than was originally contemplated." (ECF No. 159 at 8-11.) In particular, Defendants seek modification of the criteria for determining "High Risk Clients" and "Covered Clients," and Defendants' obligation to conduct due-diligence and re-investigation or termination of High Risks Clients. (*Id.*) As the FTC points out in response, Defendants "ask that the Final Order apply to a far narrower category of merchants . . . [and] their screening obligations applicable to those merchants be reduced as well." (ECF No. 198 at 21.) The Court agrees with the FTC and will deny the Motion to Modify.

Here, the Court agree with the FTC that Defendants have not met their initial burden.[20] Defendants cite to the growth in e-commerce and the "widespread" use of "tokenization[21]" as evidence of the "seismic shifts in the economy and the financial industry." (ECF No. 159 at 8-10.) But as the Court noted during the Hearing, these

---

[18]The Court denies the FTC's proposed modification to appoint a receiver (ECF No. 102 at 57-58) for the same reasons it denies the FTC's request to appoint a receiver as a coercive sanction. Moreover, the Court finds that this proposed modification is not suitably tailored.

[19]The Court incorporates the Rule 60 standard, *supra*. Moreover, as pertinent to Defendants' Motion to Modify, Rule 60(b)(5) provides the court "may relieve" a party from an order where "applying it prospectively is no longer equitable."

[20]The Court in general agrees with the FTC's arguments as to the second prong, but because Defendants have not met their initial burden, the Court does not address the second prong.

[21]Defendants describe "tokenization" as "a process that allows for repeated online transactions with a stored payment credential while keeping the underlying card number secure." (ECF No. 159 at 9.)

changes were gradual and occurred over the course of the last ten years, though perhaps the COVID-19 pandemic accelerated the use of e-commerce.[22] Moreover, as the FTC points out, the metrics for measuring the risk of fraudulent activities remains relevant even with increasing use of e-commerce and the increasing trend towards card-not-present transactions. (ECF No. 198 at 10-12.)

In sum, the Court agrees with the FTC that Defendants have not satisfied the Rule 60(b)(5) standard to allow for modification of the Final Order.

## VII.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that the FTC's Motion to Hold Defendants in Contempt and Modify the Final Order (ECF No. 64 (sealed) / 102 (unsealed)) is granted in part and denied in part. The Court finds Defendants have violated the Final Order and grants compensatory relief in the amount of $6.5 million. The Court denies the Combined Motion as it relates to coercive relief and modification of the Final Order.

It is further ordered that Defendants' Motion to Modify (ECF No. 159) is denied.

DATED THIS 13th Day of May 2026.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

---

[22]The FTC offers data in response to counter that e-commerce has grown by less than 10 percentage points in the last ten years. (ECF No. 198 at 10.)